# PETERSON v. CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

### No. 225.   Argued March 6, 7, 1907.—Decided April 8, 1907.

Foreign corporations can be served with process in a State only when doing business therein, and such service must be upon an agent who represents the corporation in such business.

Under the circumstances of this case a railroad company is not doing business in a State simply because another railroad company, of which it owns practically the entire capital stock, does do business therein, nor is the latter company or its officers and employés agents of the former company for the purpose of service of process even though such agents may at times also represent that company as to business done in other States.

There is no partnership liability under such circumstances by which the company owning or controlling the capital stock of the other can be brought into court to respond for a tort by serving the latter company with process.

THIS case comes here upon a certificate from the Circuit Court of the United States for the Northern District of Texas, raising the question of the jurisdiction of that court over an action brought by plaintiffs in error, Augusta A. Peterson and Ida Peterson, the latter a minor, suing by her mother and next friend, and both being citizens of Texas, against the Chicago, Rock Island and Pacific Railway Company, an Illinois corporation, hereinafter at times referred to as the Pacific Company.

The plaintiffs in error, wife and daughter of one John Peterson, an employé of the Pacific Company, sought recovery for the alleged negligent killing of said John Peterson while engaged as an engineer in its employ at Chickasha in the Indian Territory, on October 19, 1903. It is charged in the petition that the Pacific Company was then engaged in carrying on its business in the State of Texas in the name, and through the Chicago, Rock Island and Gulf Railroad, a corporation of the State of Texas, hereafter at times referred to as the Gulf Company, which latter corporation, it was alleged, was

an auxiliary corporation and agent of the defendant, and was then and there dominated and controlled by it, its lines of railroad being operated by the Pacific Company as a part of the Rock Island system.

It was charged that S. B. Hovey, Vice President and General Manager of the Gulf Company, residing in Tarrant County, Texas, was also the general manager and local agent of the Pacific Company in that State. It was also alleged that F. E. Merrell was the local agent in Tarrant County, Texas, of the Pacific Company, and that M. E. Sebree was the local agent for it in said county and State.

Service of citation was made on the defendants by serving the parties above named as its agents in Tarrant County, Texas, in pursuance of the statute of the State. The defendant moved to quash the service on the ground that neither of the parties were such agents, and filed in support of its motion the affidavits of each, Hovey, Merrell and Sebree, denying such agency. Thereafter plaintiffs made application for additional process in pursuance of a later statute of the State of Texas, to be hereinafter noticed, and charged that A. L. Thomas, who resides in Tarrant County, Texas, was a train conductor engaged in handling trains over the tracks of the Gulf Railroad in the State of Texas and over those of the Pacific Railroad beyond the limits of the State, and that he was engaged in running and handling passenger trains on the tracks of both said companies on both sides of the state line, and was an agent and representative of the defendant company, residing in Tarrant County, Texas. It was further charged that V. N. Turpin, who resides in Fort Worth, Tarrant County, Texas, was a ticket agent engaged in the selling of tickets and the making of contracts for transportation and for and in the behalf of the Pacific Company from the city of Fort Worth, Texas, over the lines of the Gulf Company in the State of Texas and over the line of the defendant company beyond the line of said State, and was an agent and representative of the defendant company in said State and county.

These persons, Thomas and Turpin, were accordingly served under the application for new process as the agents and representatives of the defendant company in the said county and State.

The defendant company filed a supplemental motion to quash this service upon the grounds that these persons were not the agents or representatives of the defendant company, filing their affidavits in support of said motion. In the return of the writ served on Hovey it was also set forth that he was general manager of the Pacific Company, residing in Tarrant County, Texas. The motion and supplemental motion to quash the service was heard by the court, the motion sustained and the cause dismissed for want of jurisdiction, the court holding that the defendant had not been properly served with process.

From the stipulated facts, documentary evidence and testimony embodied in the bill of exceptions the following facts, pertinent to the determination of the issues, may be gathered:

The Pacific Company and the Gulf Company are both of the "Rock Island System" of railroads. The second annual report of the "Rock Island Company" June 30, 1904, shows that it is the owner of the entire capital stock, except directors' shares, of the Chicago, Rock Island and Pacific Railroad Company, a corporation of Iowa; that company owns 695,574.75 shares of the capital stock of the Chicago, Rock Island and Pacific Railway Company, a corporation of the States of Illinois and Iowa, and 286,349 shares of the common capital stock of the St. Louis and San Francisco Railroad Company, a corporation of the State of Missouri, and the report adds:

"Each of the two latter companies operates independently its lines of railway and each is interested through the ownership, directly or indirectly, of at least the majority of the capital stock, in certain subsidiary companies, each of which operates its property independently. The lines of the Chicago, Rock Island and Pacific Railway Company, including lines

formerly of the Choctaw, Oklahoma and Gulf Railroad Company, the Burlington, Cedar Rapids and Northern Railway Company, and the Rock Island and Peoria Railway Company, together with the lines of its subsidiary companies, namely, the Chicago, Rock Island and Gulf Railway Company, and the Chicago, Rock Island and El Paso Railway Company, comprise what is known as the 'Rock Island System.'

"As the Rock Island Company is the owner of the entire capital stock, except directors' shares, of the Chicago, Rock Island and Pacific Railroad Company, the income of both the companies is included in the following statement."

This report purports to be made by order of the board of directors, was dated October 17, 1904, and was signed by Robert Mather, President. Appended to this report as a part of it, under the head of "Statements and Exhibits, Rock Island System Lines," was the following statement, to wit:

"On page 23 of said report, under the heading of 'Rock Island System—State of Mileage Operated: '

" The Chicago, Rock Island and Gulf Railway Company:

| | |
|---|---:|
| Terral, I. T. (Red River), to Dallas, Texas........-...: | 126.67 |
| Bridgeport, Texas, to Graham, Texas.............;..... | 53.29 |
| Texhoma, O. T., to Bravo, Texas-New Mexico state line........................................ | 91.75 |
| Texola, O. T. (Texas state line), to Amarillo, Texas... | 112.97 |
| Total Chicago, Rock Island and Gulf Railway Company..................................... | 386.68" |

Plaintiff also introduced in evidence a railroad folder, dated July 10, 1904, on which was printed in large letters "Rock Island System Time Table," in which appears the names of the Chicago, Rock Island and Pacific Railway Company; Chicago, Rock Island and El Paso Railway Company, and the Chicago, Rock Island and Gulf Railway Company; with a list of the names and residences of the passenger and freight agents, and a schedule of the passenger trains on said lines.

On the inside of the cover of the folder is a map showing the lines of the said railroad company, so connected as to belong to one system. Below the map is printed:

"The Rock Island System of America.

"The Rock Island System covers a territory which is 1,000 miles long by 1,000 miles wide, supports a population of more than 21,000,000 people and is capable of supporting at least four times that many. The area of this territory is as great as the combined area of France, Germany, Italy, Spain, Austria-Hungary, Denmark, the Netherlands, Turkey, Switzerland and Greece, and its productive capacity is greater.

"Here are produced more than half the wheat, more than half the corn, and nearly half the cotton, silver, and gold produced in the United States."

The origin of the Gulf Company is thus stated in the annual report of the Rock Island road, June 30, 1904:

*"Consolidation of Texas Lines.*

"The legislature of the State of Texas, by an act passed March 27th, 1903, authorized the sale of the railroads and properties of the Chicago, Rock Island and Texas Railway Company, extending from the Red River to Fort Worth, Texas, with a branch from Bridgeport, Texas, to Graham, Texas. The Chicago, Rock Island and Mexico Railway Company extending from the Texas-Oklahoma line near Texhoma to the Texas-New Mexico line at Bravo; and the Choctaw-Oklahoma and Texas Railroad Company, extending the Texas-Oklahoma line near Texola, Texas, to Amarillo, Texas, to the Chicago, Rock Island and Gulf Railway Company, which had constructed a line of railroad from Dallas, Texas, to Fort Worth, Texas, where it connected with the line first named above.

"In accordance with the authority granted, the properties referred to were, by appropriate corporate action, deeded to the Chicago, Rock Island and Gulf Railway Company on December 1, 1903.

"This consolidation permits the properties in question to be operated by one management instead of four separate sets of officials, as heretofore, resulting in economy of operation and greater efficiency in service.

"In stating the assets and liabilities of the companies forming the system, the holdings of the Chicago, Rock Island and Pacific Railway Company in the bonds and capital stock of auxiliary lines, together with loans between system companies, have been eliminated from the liabilities and a like reduction made in the value of the assets; the figures as stated, therefore, represent the value of the assets and the real liability without duplication."

Plaintiffs also introduced in evidence the twenty-fourth annual report of the Pacific Company for the year ending June 30, 1904, in which it is set forth:

"They have included therein operations and affairs of the operated lines and auxiliary companies forming the 'Rock Island System.'

"In order to make exhibits comparative the figures for the last preceding year have been restated to meet changed conditions due to the including in this report the operation of the auxiliary companies.

"These lines, thus forming the Rock Island System, are the following:

*" Mileage Operated.*

The Chicago, Rock Island and Pacific Railway ....... 6,760.74
The Chicago, Rock Island and El Paso Railway ...... 111.50
The Chicago, Rock Island and Gulf Railway ........... 386.92

"On page 9 of said report, under the head of 'Property' and 'Franchises,' occur the following:

"During the year expenditures were made for construction of extensions and completion of system lines as follows:
Fort Worth, Texas, to Dallas, Texas ............ $111,371 55
Yarnall, Texas, to Amarillo, Texas ............... 108,615 64
Jacksboro, Texas, to Graham, Texas ............. 32,138 96

Red River to Fort Worth, Texas. . . : . . . . . . . . . . . . . .  28,013 04
Texhoma (Texas state line) to Bravo, Texas. . . . . . .  9,646 .03
Texola (Texas state line) to Yarnall, Texas. . . . . . . .  2,328 30

"In addition to the expenditures during the year as above, there has been transferred to property account sundry amounts expended prior to July 1st, 1903, for construction of new lines and shops, and purchase of equipment, which have been heretofore stated in the system assets as 'Advances for Construction and Equipment,' the property represented by such amounts having been deeded to the Chicago, Rock Island and Pacific Railway Company or the Chicago, Rock Island and Gulf Railway Company, $23,169.83.

"There has also been transferred to this account the expenditures made prior to July 1st, 1903, for the purchase of shares of capital stock of the Burlington, Cedar Rapids and Northern Railway Company and the Rock Island and Peoria Railway Company, also cost of stock of the Choctaw, Oklahoma and Gulf Railroad Company in excess of its par value and the value of bonds of the Chicago, Rock Island and Texas Railway Company, owned by the Chicago, Rock Island and Pacific Railway Company, the value of said property appearing upon balance sheets shown in prior year's report as 'Stocks and Bonds of Constituent Companies,' $16,446,009.73.

"On page 11 of said report, under the heading ' New Lines Open for Operation,' the following statements are made, viz:

"Additions have been made to the operated system— mileage since the last report as follows:

"By the Chicago, Rock Island and Gulf Railway Company, Fort Worth, Texas, to Dallas, Texas, 33.26 miles, opened for operation in December, 1903.

"Yarnall, Texas, to end of track west of Amarillo, Texas, 18.40 miles, opened for operation in November, 1903.

"Corrections in measurements, Red River to Fort Worth, Texas, .83 miles.

"Operated system mileage was decreased 18.22 miles between Yarnall, Texas, and Amarillo, Texas.

"Fort Worth, Texas, to Dallas, Texas.—This line was completed and the line opened for operation by the Chicago, Rock Island and Gulf Railway Company, December 1st, 1903. It is 33.26 miles in length, connecting with the line of the former the Chicago, Rock Island and Texas Railway Company at Fort Worth, and extending to Dallas, where, by an agreement with the Gulf, Colorado and Santa Fe Railway Company, it has the joint use of the latter company's terminal facilities.

"The opening of this line gives the Gulf Company direct entrance into Dallas, enabling it to compete for the traffic of that important commercial center.

"On page 12 of said report is the following statement, viz:

"*System Mileage Under Construction.*

" By the Chicago, Rock Island and Gulf Railway Company: Amarillo, Texas, to Texas-New Mexico boundary....... 69.87

"Amarillo, Texas, to Tucumcari, N. M. The grading for a considerable portion of this line has been done from Amarillo westward.

"It was deemed advisable, however, to suspend active construction until such time as the business outlook would warrant the expenditure necessary to complete."

Upon the hearing, counsel made an agreed statement of facts, as follows:

"The Chicago, Rock Island and Pacific Railway Company is a consolidated corporation, chartered under the laws of Illinois and Iowa. It has been an existing railroad corporation for over twenty years. In June of the year 1892 and for some years prior to that time the said railway company owned and operated a line of railway from the city of Chicago in a southwesterly direction through the States of Illinois, Iowa, Missouri and Kansas to Minco, Indian Territory. During the year 1892 this company extended its line from Minco, Indian Territory, in a southerly direction to the north boundary line of Texas in Montague County.

"The Chicago, Rock Island and Texas Railway Company was a corporation organized under the laws of Texas on the 15th day of July, 1892. It had an authorized capital stock of three million dollars, in shares of one hundred dollars each, of which seven hundred and fifty-four shares were subscribed for at the time of its organization. Below is a list of the names of the stockholders and the number of shares of capital stock of this company subscribed for by each, at its original organization.

[The list shows that of the 754 shares subscribed, 745 were held by one of the attorneys of the Pacific Company, and of the other 9 shares, 3 were held by other employés of that road.]

"Under the charter of the Chicago, Rock Island and Texas Railway Company, it was authorized to construct a line of road from the north boundary line of Texas at a point in Montague County in a southerly direction through Montague, Wise and Parker Counties; the charter being afterward amended, authorized the construction into Tarrant County. This charter authorized the issuance of first mortgage bonds amounting to fifteen thousand dollars per mile for construction and not exceeding five thousand per mile for equipment.

"When the Chicago, Rock Island and Pacific Railway Company constructed its line to a point near the north bank of the Red River, north of Montague County, construction work stopped for a period of time. The Chicago, Rock Island and Texas Railway Company began the construction of its line at the north line of the State in Montague County some time after the Chicago, Rock Island and Pacific Railway Company stopped work at a point north of Red River. After construction work began on the Chicago, Rock Island and Texas Railway Company south of Red River, the Chicago, Rock Island and Pacific Railway Company constructed its line from the point where work had stopped north of Red River, to a connection with the Chicago, Rock Island and Texas Railway Company at the state line. The Texas com-

pany finished the construction of its line into Fort Worth in the latter part of 1893. Some of the same contractors who constructed the Chicago, Rock Island and Pacific Railway from Minco south to Red River also took contracts for work on the Texas line.

"On the 2d day of January, 1893, after the Chicago, Rock Island and Texas Railway Company had constructed and was operating its line as far south as Bowie, Texas, it entered into an agreement with the Chicago, Rock Island and Pacific Railway Company, a true copy of which is hereto attached and marked 'Exhibit A' for identification. This agreement went into effect immediately after it was executed, and was acted upon and observed by said companies until the 14th day of April, 1903, when the same was canceled under authority of the board of directors of each company by a written agreement, a true copy of which is hereto attached, marked 'Exhibit B' for identification.

[Exhibits A and B are not printed, as they are the contract and cancellation thereof, both made before the present case arose.]

"After the Chicago, Rock Island and Texas Railway Company had constructed its line, it issued first mortgage bonds to the extent of fifteen thousand dollars per mile thereon, and these bonds were purchased by the Chicago, Rock Island and Pacific Railway Company, for which it paid the Texas line one hundred cents on the dollar. The Chicago, Rock Island and Texas line cost a large sum of money in excess of the amounts for which it issued bonds, which additional cost was paid by application of money subscribed by the stockholders and by borrowing from the Chicago, Rock Island and Pacific Railway Company, which money so borrowed has long since been returned with interest.

"At the time the Chicago, Rock Island and Pacific Railway Company constructed its line to Red River there was no town or city at that particular point, but there were towns and cities south, east and west of there in the State of Texas,

and a railroad line, being a part of the Missouri, Kansas and Texas Railway of Texas, nine miles south of that point.

"When the Chicago, Rock Island and Texas Railway Company was first organized its general offices were located at Bowie, Montague County, Texas, and remained there for some time, until the charter was amended removing them to Fort Worth. The first general officers elected by the Chicago, Rock Island and Texas Railway Company, and their residences, were as follows: M. A. Low, Topeka, Kansas, President; J. C. McCabe, Bowie, Texas, General Freight Agent, and H. F. Weber, Bowie, Texas, Vice President, Superintendent, Secretary and Treasurer. All these men, prior to the time they were elected officials of the Chicago, Rock Island and Texas Railway Company had been employed in some capacity by the Chicago, Rock. Island and Pacific Railway Company. In 1893 S. B. Hovey was elected Vice President of the Texas company and remained the Vice President and Superintendent of the Chicago, Rock Island and Texas Railway Company from that date until it was sold out under an act of the legislature in 1903. Mr. M. E. Sebree, who was served with citation in this case, was, for a number of years and until the date of its sale, trainmaster of the Chicago, Rock Island and Texas Railway Company and assistant trainmaster of the Chicago, Rock Island and Pacific Railway Company, with jurisdiction on that line up to Chickasha, Indian Territory. Prior to the time he was employed by the Chicago, Rock Island and Texas Railway Company he had been employed by the Chicago, Rock Island and Pacific Railway Company as brakeman, conductor, etc. M. A. Low, of Topeka, Kansas, remained the President of the Chicago, Rock Island and Texas Railway Company from its organization until the 8th day of November, 1900, during all of which time he was one of the general attorneys of the Chicago, Rock Island and Pacific Railway Company.

"The Chicago, Rock Island and Texas Railway Company never issued or sold any equipment bonds, but before it was

sold out under special act of the legislature to the Chicago, Rock Island and Gulf Railway Company, it had purchased and was the owner of between one thousand and twelve hundred freight cars of various kinds. During the time it had no equipment of its own, it rented rolling stock from various railway companies, but principally from the Chicago, Rock Island and Pacific Railway Company, and paid therefor prices prevailing between other lines of railway in the State of Texas.

"After the Chicago, Rock Island and Texas Railway Company constructed its line into Fort Worth from Bowie and after the execution of the contract between it and the Chicago, Rock Island and Pacific Railway Company, of date of January 2d, 1893, the most of the passenger and freight trains running over its line from Red River to Fort Worth and from Fort Worth to Red River were operated beyond its lines as the trains of the Chicago, Rock Island and Pacific Railway Company. The employés operating these trains were under the control of and paid by the Chicago, Rock Island and Texas Railway Company while working on its line, and they were also under the control of and paid by the Chicago, Rock Island and Pacific Railway Company while on its line. The equipment in the various trains went as far north as the business justified, some of the passenger equipment going as far as Chicago, and some to Kansas City, while the freight equipment stopped at points beginning at Chickasha, and from there north wherever the freight was destined. The passenger equipment coming south stopped at Fort Worth and the freight equipment, where the freight was handled in carload lots, went to destination, wherever that might be.

"Whenever necessary the Texas company would operate a local train to handle freight between Fort Worth and Red River, but as a general rule the through service maintained took care of this business. It operated a local freight and passenger train between Bridgeport and Jacksboro and afterward to Graham from the time that branch was built until it was sold out, which was several years. On the through

freight trains the run made by the crews was from Fort Worth to. Chickasha and on the through passenger train the run made by the crews was from Fort Worth to Caldwell, Kansas, these crews being handled and paid as above set forth. Outside the Pullman cars, which were in each passenger train, nearly· all the passenger equipment used by the Chicago, Rock Island and Texas Railway Company belonged to the Chicago, Rock Island and Pacific Railway Company, for which it paid rental, as provided for under the terms of the contract herein first referred to.

"Defendant's witness will testify that the Texas company paid no part of the cost of operating the Chicago, Rock Island and Pacific Railway, nor did the Pacific Company pay any part of the cost of the operation of the Chicago, Rock Island and· Texas Railway, nor did either of them participate in the earnings of the other. The relationship between the companies is fully disclosed by the terms of the contract dated January. 2d, 1893, which was observed up to the time of its cancellation.

"The passenger conductors, brakemen and train guards wear regular train uniforms and on the lapel of the coat are the words 'Rock Island,' and on the cap is the word 'Conductor,' 'Brakeman' or 'Porter.' Any member of these train crews, while working on the line of the Texas company, may be discharged by the proper officer of that company; and while working on the line of the Pacific Company may be discharged by the proper officer of that company. Either company, of course, employs additional men when needed.

· "At the time the contract of January 2d, 1893, was canceled the Chicago, Rock Island and Texas Railway Company was operating about an hundred and forty miles of road, and the Chicago, Rock Island and Pacific was operating about three thousand three hundred miles. For a considerable time after the Chicago, Rock Island and Texas Railway Company was built into Fort Worth it employed and maintained at its Fort Worth office a train dispatcher, who gave orders for the

movement of trains over its line, but as a matter of economy this was abolished, and the Texas company paid a part of the salary of the train dispatcher located at Chickasha to give orders for the movement of trains over its rails.

"On the 22d day of September, 1903, the Chicago, Rock Island and Texas Railway Company, under authority cf a special act of the legislature known as Senate Bill No. 161, was purchased and absorbed by the Chicago, Rock Island and Gulf Railway Company, and since that time has ceased to exist as a railroad or do any business as such.

"At the time the Gulf Company purchased the Texas company it had constructed and was operating a line of road from Fort Worth in Tarrant County to Dallas in Dallas County. The Chicago, Rock Island and Gulf Railway Company now owns and operates three hundred and eighty-six miles of road, all of which is located inside of the State of Texas. It does not own any railroad outside the State of Texas. It owns at the present time about sixteen hundred cars, including ballast, refrigerator and cattle cars, twenty locomotives, and eight cabooses, but does not own any passenger equipment other than the Pullman cars which are used in each of its passenger trains; it rents its passenger equipment from the Chicago, Rock Island and Pacific Railway Company, and pays therefor current rental charged by connecting lines in Texas. The train crews on both the through passenger and freight trains are handled in the same way that they were when the line into Fort Worth was operated by the Chicago, Rock Island and Texas Railway Company, but the Chicago, Rock Island and Gulf Railway Company is now operating in many places local trains between local points in Texas.

"The following is a list of stockholders and the amount of stock of the Chicago, Rock Island and Gulf Railway Company owned by each.

[The list is not printed, as the record discloses that, except directors' shares, the stock is held for the Chicago, Rock Island and Pacific Railway Company.]

"The Chicago, Rock Island and Gulf Railway Company is operating under a lease that part of the line of the Chicago, Rock Island and Pacific Railway Company which begins at the north boundary line of the State of Texas, extending northward to the town of Terral, Indian Territory, a distance of about $1\frac{1}{8}$ miles.

"Blank passes, properly signed by different railroads, including the Chicago, Rock Island and Pacific, Texas and Pacific, Houston and Texas Central and other lines are sometimes placed with S. B. Hovey, and when so placed he has the permission of such line to fill in the names of parties and countersign the pass, and when so countersigned such pass is recognized by the line over which it is issued. The local ticket agents of the Chicago, Rock Island and Gulf Railway Company sell coupon tickets over the Chicago, Rock Island and Pacific Railway Company's line and nearly all other lines in the United States, which tickets are duly honored by the respective roads over which they read. The Chicago, Rock Island and Gulf Railway Company operates only one passenger train each way daily between Fort Worth and Dallas, while it operates two trains each way from Fort Worth north. It operates also only a local freight service between Fort Worth and Dallas, but no through freight service. Proper officials of the Chicago, Rock Island and Gulf Railway Company and of the Chicago, Rock Island and Pacific Railway Company exchange reports with each other as to the amount of exchange business done.

"No dividends were ever paid on the stock of the Chicago, Rock Island and Texas Railway Company, and none have been paid on that of the Chicago, Rock Island and Gulf Railway Company. The net earnings of the Chicago, Rock Island and Texas Railway Company were put into betterments and improvements, and the same is the case with the Chicago, Rock Island and Gulf.

"In 1897, L. G. Hastings, then secretary of the Chicago, Rock Island and Texas Railway Company, reported to the

Interstate Commerce Commission that the Chicago, Rock Island and Texas Railway Company was controlled by the Chicago, Rock Island and Pacific Railway Company, through the ownership of a majority of its bonds. In 1899 he reported it as controlled by the Pacific Company, through its ownership of a majority of its capital stock.

"On the 2d day of August, 1904, M. E. Sebree, who resides in Fort Worth, Texas, was trainmaster of the Chicago, Rock Island and Gulf Railway Company, and was also assistant trainmaster of the Chicago, Rock Island and Pacific Railway Company between the north line of Texas and Chickasha, Indian Territory. He is paid by the Gulf Company for the work he does for it and by the Pacific Company for the work he does for it. S. B. Hovey is Vice President and Superintendent of the Chicago, Rock Island and Gulf Railway Company, and will testify that he is not connected with, nor does he perform any service for, any other railroad.

"After making certain changes and additions, the Chicago, Rock Island and Gulf Railway Company adopted the book of rules issued by the Chicago, Rock Island and Pacific Railway Company for the control of the operation of its line, and such rules are now in force. The cars and engines belonging to the Chicago, Rock Island and Gulf Railway Company, when in need of repairs, have the work done at its shops at Fort Worth and Dallas, if the cars and engines are convenient to these two points; otherwise, the work is done at some other convenient place, either on or off the line of the Chicago, Rock Island and Pacific Railway Company, wherever the cars or engines may be at the time the repairs are needed.

"On the 2d day of August, 1904, the Chicago, Rock Island and Gulf Railway Company had a different president and altogether different executive officers from any of the lines above listed as included in the Rock Island system. The Chicago, Rock Island and Gulf Railway Company does not now and never has paid any part of the salary of any officer of the Chicago, Rock Island and Pacific Railway Company,

or of any of the lines named as constituting the Rock Island System.

"Before the Chicago, Rock Island and Gulf Railway Company purchased the Chicago, Rock Island and Texas Railway Company, the Chicago, Rock Island and Mexico Railway Company and the Choctaw, Oklahoma and Texas Railroad Company, M. E. Sebree was trainmaster of the Chicago, Rock Island and Texas Railway Company and division trainmaster of the Chicago, Rock Island and Pacific Railway Company, with jurisdiction to Chickasha, Indian Territory. Since the purchase by the Gulf Company of the above-named Texas lines Mr. Sebree's jurisdiction extends over what were the Chicago, Rock Island and Mexico Railway Company and the Choctaw, Oklahoma and Texas Railroad Company, otherwise there has been no change in his employment or jurisdiction for the past five to ten years.

"The Chicago, Rock Island and Gulf Railway Company pays a portion of the salary of a joint train dispatcher located at Chickasha, Indian Territory, under the same character of arrangement which existed between the Chicago, Rock Island and Texas Railway Company and the Chicago, Rock Island and Pacific Railway Company. This train dispatcher in giving orders for the handling of trains on the Chicago, Rock Island and Gulf Railway Company is subject to the control, direction and supervision of the executive officers of the Chicago, Rock Island and Gulf Railway Company as if exclusively employed by it.

"The rails of the Chicago, Rock Island and Gulf Railway Company on the line running from Fort Worth north connect at the state line with the rails of the Chicago, Rock Island and Pacific Railway Company. The point of connection is somewhere near the middle of Red River on a bridge. At this particular point there is no town, station or turnout, and the trains going in either direction do not stop at said point. It was not possible to build a town or station at the exact point of connection."

It was further stipulated as to Thomas, the conductor, and Turpin, the ticket agent, after they were served with process, as follows:

A. L. Thomas "was at the date of said service and is now and has for many years been a conductor running on and handling passenger trains for the defendant, the. Chicago, Rock Island and Pacific Railway Company, the Chicago, Rock Island and Texas Railway Company, and later on the Chicago, Rock Island and Gulf Railway Company, after its purchase of the Texas company, running and handling such trains between Fort Worth, Texas, and Caldwell, Kansas. That the run of said Thomas is now and has been from Fort Worth, Texas, to Caldwell, Kansas, as aforesaid, on both sides of the state line, and that Caldwell, Kansas, is the end of the first passenger division on said lines north of Fort Worth. And it is further agreed that V. N. Turpin, upon whom process was served herein as the ticket agent of the defendant company was, at the date of the service of said process and has been for a long time ticket agent of the Chicago, Rock Island and Gulf Railway Company at Fort Worth, engaged in selling tickets for the said Chicago, Rock Island and Gulf Railway Company, over its lines and also over the lines of the Chicago, Rock Island and Pacific Railway Company and all of its connections. It is further agreed that the facts are that 'Thomas is carried on the Pacific Company's pay roll and paid for services rendered while on that company's line north of the Texas state line; and is carried on the Gulf Company's pay roll and paid by the Gulf Company for services rendered on its line south of the Texas state line; and that Turpin is carried on the Gulf Company's pay roll alone, and is not carried on the Pacific Company's pay roll, and is not an agent of the Pacific Company, unless the above stated facts make him one.' "

The annual report of the Pacific Company shows that the board of directors of said company consists of thirteen members, with an executive committee of eight members.

The report of the Rock Island Company shows that the board of directors of said company consists of sixteen members and its financial committee of six members.

Eleven members of the board of directors of the Pacific Company are also members of the board of directors of the Rock Island Company. Five members of the executive committee of the Pacific Company are also members of the finance committee of the Rock Island Company. The officers of the Rock Island Company, with two exceptions, are also officers of the Pacific Company and a majority of the officers of either said companies are common to both of them.

S. B. Hovey, upon whom service was made as aforesaid, was also produced as a witness, and testified that at the time of the service of citation upon him he was the Vice President and Superintendent of the Gulf Railroad Company, and resided at Fort Worth, Texas; that he held the same position in the Chicago, Rock Island and Texas Company before it acquired the Gulf Company, and before that time he had been for many years an employé of the Pacific Company; that the train dispatcher of the Pacific Company, located on its lines at Chickasha, in the Indian Territory, is also train dispatcher of the Gulf Company. He was a "joint man," as the trains were operated by the same crews across the Texas state line without stopping; that the movements of trains on the Gulf route are directed from Chickasha as are those on the line of the Pacific Company after they cross the state line going northward. The daily reports of the cars on the Gulf line are made to the chief dispatcher at Chickasha; that the business could not be handled in any other way.

Settlements between the two companies are made on a mileage basis. Reports are made by the officers of the Gulf Company and Mr. Winchel, who is President of the Gulf Company and of the Pacific Company. The Gulf Company keeps a fund on deposit with the Pacific Company at Chicago and receives interest thereon; that when the defendant company

constructed its line of road across the Red River in 1892, the
Texas Company was organized, and the Pacific Company
furnished the money with which the road was constructed
south from Red River to Fort Worth. Most of the directors
of the Texas Company were employés of the Pacific Company.
No dividends were paid on the stock of the Texas Company,
and when the Gulf Company took over its property the·di-
rectors surrendered their stock in the old company and got
back their $5.00 each; that the transfer to the Gulf Company
of the Texas road, the El Paso road and the Mexico road was
for the purpose of consolidating these roads and getting under
one management, the management of the system. The
employés who run over both the Pacific and Gulf lines while
in Texas are employed and discharged by the latter company;
north of the Texas line they are employed and discharged
by the Pacific Company; the operation of trains was then
as it had been before the Rock Island and Texas road ceased
to exist; that the Pacific Company did not pay any part of
the salaries of the heads of the·departments of the Gulf Com-
pany—none for the general office. It, the Pacific Company,
pays the train men according to the number of miles run on
its rails. The Gulf·Company pays the expenses of the men
while on the rails of that company according to the number
of miles run; that the Rock Island and Gulf Company had
separate cars, servants and agents of its own; that the Gulf
Company lines booked trains daily between Fort Worth and
its northern terminus and back, which trains do not run on
the lines of the Pacific road. He also testified that the lines
mentioned on the Rock Island folder as constituents of the
Rock Island System, namely, the Chicago, Rock Island and
Mexico; the Chicago, Rock Island and El Paso; the Choctaw,
Oklahoma and Gulf; the Chicago, Rock Island and Texas;
and the Chicago, Rock Island and Pacific, were not operated
as one road, but were operated separately; that the revenues
were divided just as revenues earned by the Chicago, Rock
Island and Gulf and T. & P. would be divided; that they were

divided on a mileage basis; that no reports were made by the
Gulf Company to the head of the traffic department of the
Pacific Company; that reports were made by the Gulf Com-
pany to the President of the Gulf Company, who was also
President of the Pacific Company; that no representative
of the Pacific Company was sent to examine the books of the
Gulf Company further than just as a representative of any
other connecting line would occasionally check up business
with the Gulf Company; that the books of the latter company
had never been audited from the Chicago office; that there
was no contract between the Gulf Company and the Pacific
Company, except a traffic agreement as to the division of rates,
made by the general freight agent of each line, of the same
character of contracts which exist between the Gulf Company
and other lines with which it interchanges business; that the
Gulf Company owned about 1,500 or 1,600 freight and cattle
cars and about twenty engines, which were marked C. R. I.
and G.; the train dispatcher has no power to furnish cars on
the Gulf road " if I instruct him not to do so "; that since he had
been Vice President of the Gulf Company, he had had no
connection whatever with the Pacific Company and no duties
to perform with any other railroad than the Gulf Company;
that for traffic hauled over the two lines the Gulf Company
received the amount agreed upon by the general freight agents
in the same manner that the Gulf Company and the T. and P.
divided the revenues; that neither road pays any part for mov-
ing freight over the other line, nor pays any part of the loss
sustained while in the hands of the other company by dam-
age to freight; that the Gulf Company has on deposit with the
Pacific Company several hundred thousand dollars, for which
it receives six per cent interest per annum. When needed it
is checked out.

A copy of the folder of the "Rock Island System's" lines
was sent up with the record. A copy of the map shown on
the folder is printed on the freight window of the office of the
agent of the Gulf Company and calendars with that map

printed on them are distributed for the purpose of advertising the system lines.

*Mr. D. T. Bomar*, with whom *Mr. Sam. J. Hunter* was on the brief, for plaintiffs in error, submitted:

By organizing the Chicago, Rock Island and Texas Railway Company, and through it operating the railroad in Texas, the Chicago, Rock Island and Pacific Railway Company was doing its business in Texas by and through those persons who purported to represent the sub-corporation, and the principal corporation was legally in Texas through its said agents, and was liable to suits in the courts of this State by service of process upon the agents which represented it in that business. *St. Claire* v. *Cox*, 106 U. S. 350; *Hatcher* v. *Leasing Co.*, 75 Fed. Rep. 368; *Manufacturing Co.* v. *Kelly*, 160 U. S. 327; *S. C.*, 16 Sup. Ct. 307; *Pennsylvania R. Co.* v. *Anoka Nat'l Bank*, 47 C. C. A. 454; *S. C.*, 108 Fed. Rep. 482; *Norton* v. *Railroad Co.*, 61 Fed. Rep. 618; *Interstate Tel. Co.* v. *Baltimore & O. Tel. Co.*, 51 Fed. Rep. 49; *Montgomery* v. *Frobes*, 148 Massachusetts, 252; *Day* v. *Telegraph Co.*, 66 Maryland, 365.

Since the defendant company so completely owns, dominates and controls the auxiliary corporation through its ownership of the stocks and bonds of the latter company, the contract mentioned became useless and its cancellation did not lessen or affect the control of the defendant over the subordinate corporation. It follows that the service had on the officers and agents of the latter company was valid service on the defendant. *Buie* v. *C., R. I. & P. Ry. Co.*, *supra*, also other cases *supra* and the authorities there cited and reviewed. See also the following authorities: *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Van Dresser* v. *Oregon Ry. & Nav. Co.*, 48 Fed. Rep. 202; *Lehigh Valley Ry. Co.* v. *Dupont*, 128 Fed. Rep. 841; *Newcomb* v. *N. Y. Cent. Ry. Co.*, 81 S. W. Rep. 1072; *Oriental Invest. Co.* v. *Barclay*, 64 S. W. Rep. 87; *C. & O. Ry. Co.* v. *Howard*, 178 U. S. 153–167; *Tuchband* v. *C. &*

*A. Ry. Co.* 115 N. Y. 437; 6 Thomp. Corp., §§ 7505, 8034, 8037; *Barrow Steamship Co.* v. *Kane,* 170 U. S. 100.

The facts established by the agreement of counsel for the defendant and by evidence that was undisputed, show conclusively that the Chicago, Rock Island and Gulf Railway Company was and is controlled and dominated by defendant in such a way and to such an extent as to make it such a local agent of defendant in Texas as is contemplated by Art. 1223 of the Texas statutes, and such facts show conclusively that S. B. Hovey, F. E. Merrell and M. E. Sebree who were severally served with process in this case were each and all such agents of defendant as is contemplated by said statute.

The parties served with process at the time of such service sustained to the defendant the exact relation prescribed by Texas statute regulating such service. Such statute was enacted to provide for the service of process in just such cases as this one and to meet the conditions here presented. The real question at issue, therefore, is: Had the Texas legislature the power to enact such law? If yea, then the service was valid service on the defendant. *Barrow Steamship Co.* v. *Kane,* 170 U. S. 107, 108; *Lafayette Ins. Co.* v. *French,* 18 How. 404; *Ex parte Schollenberger,* 96 U. S. 369; *New England Mut. L. Ins. Co.* v. *Woodworth,* 111 U. S. 138, 146; *Shaw* v. *Quincy Mining Co.* (*Ex parte Shaw*), 145 U. S. 444, 452.

*Mr. M. A. Low* for defendant in error:

A foreign corporation can only do business in a State with its consent expressed or implied. The laws of Texas give no such express consent to a foreign railway company and none can be implied, either from its laws or its action with respect to such corporations. It does not authorize a foreign railway company to own, lease or operate a railway within the State. There is nothing in the record to show that the Rock Island Company was doing business in Texas with the consent of the State. *The Lafayette Ins. Co.* v. *French,* 18 How. 404;

*St. Clair* v. *Cox*, 106 U. S. 350; *Barrow Steamship Company* v. *Kane*, 170 U. S. 100.

The evidence offered on the hearing of the motions to quash the service of citations was not sufficient to show that the Rock Island Company was doing business in Texas. As a matter of law, it could not own, lease or operate the railway of the Gulf Company; nor could these companies consolidate. On the facts stated in the petition the court will take judicial notice that each company was a separate and independent corporation, created under the laws of different States, and that they could not be one company, substantially or otherwise, because they had no power to so unite.

The fact that the Rock Island Company loaned money to the Texas Company to assist it in constructing or extending its railway, that it owned all or any part of the capital stock of the Gulf Company, and that it exercised such authority in the selection of directors of the company as a stockholder lawfully may, does not tend to show that it was doing business in Texas. *United States* v. *American Bell Telephone Co.*, 29 Fed. Rep. 17; *Pullman Car Co.* v. *Missouri Pacific Co.*, 115 U. S. 587, 596; *Potter* v. *Pittsburg Steel Co.*, 120 U. S. 649; *Pennsylvania R. R. Co.* v. *Jones*, 155 U. S. 333, 344; *Earle* v. *Chesapeake & O. Ry. Co.*, 127 Fed. Rep. 235; *Central Grain & Stock Exch.* v. *Board of Trade*, 125 Fed. Rep. 463; *St. Louis & S. W. R. Co.* v. *Gate City Co-operative Co.*, 70 Arkansas, 10; *St. Louis & Southwestern R. Co.* v. *Smith*, 71 Arkansas, 290; *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406.

None of the citations issued in this case was legally served, and on the facts in evidence, the court did not err in sustaining the motion to quash.

To the validity of service of process upon a foreign corporation, it is necessary that the corporation be at the time actually and substantially doing business in the State, and that the service be made upon an agent representing the corporation with respect to the business carried on in the State, in such a capacity that, in the absence of express authority,

acquiescence in the exercise of, such authority ought to be clearly implied. , The, agent upon whom service is made must sustain such·a representative relation to the business transacted by the corporation in the State· as to charge him with the duty of accepting service.' Story on Agency, § 140; *St. Clair* v. *Cox*, 106. U. S. 350, 357; *Fitzgerald Const. Co.* v. *Fitzgerald*, 137 U. S. 98–106; *Mexican Central Ry.* v. *Pinkney*, 149 U. S. · 194; *Goldey* v. *Morning News*, 156 U. S. .518, 521, 522; *United States* v. *American Bell Telephone Co.*, 29 Fed. Rep. 17; ·*Mutual Life Ins. Co.* v. *Spratley*, 172 U. S. 602, 617, 619; *Earle* v. *Chesapeake & O. Ry. Co.*, 127 Fed. Rep. 235, 240; *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406; *Central Grain & Stock Exchange* v. *Board of Trade*, 125 Fed. Rep. 463; *N. K. Fairbanks & Co.* v. *Cincinnati N. O. & T. P. Ry. Co.*, 54 Fed. Rep. 420, 423; *Strain* v. *Chicago Portrait Co.*, 126 Fed. Rep. 831, 833, 834; *Frawley* v. *Pennsylvania Casualty Co.*, 124· Fed. Rep. 259; *Union Pacific R. Co.* v. *Miller*, 87 Illinois, 45.

·Service upon· one partner or joint obligor will not confer jurisdiction ·to render a personal judgment against another partner or joint obligor.·· *D'Arcy* v. *Ketchum*, 11 How. 165; *Goldey* v. *Morning News*, 156 U. S. 521; *In re Grossmayer*, 177 U. S. 48; *Kingsley* v. *Great Northern R. Co.*, 91 Wisconsin, 380. ,

··Mr. Justice·· Day, after making the foregoing, statement, delivered the opinion of the court.

This case ·presents a question of jurisdiction to be determined as one of fact.· It may be divided into two propositions: First.· Was the Pacific Company doing business in the State of. Texas?· Secondly. If so, ·were the alleged agents served with process in the State of Texas duly authorized as such and ·competent to be thus served, in such wise as to give jurisdiction of the Pacific Company?

·The statutes which, concern service on· corporations in the State of Texas are as follows (Sayles'· Texas Civil Statutes):·

"Art. 1194, Sec. 25. Foreign, private or public corporations, etc.—Foreign, private or public corporations, joint stock companies or associations, not incorporated by the laws of this State, and doing business within this State, may be sued in any court within this State having jurisdiction over the subject matter, in any county where the cause of action or a part thereof accrued, or in any county where such company may have an agency or representative, or in the county in which the principal office of such company may be situated; or when the defendant corporation has no agent or representative in the State, then in the county where the plaintiffs or either of them reside."

"Art. 1223. Foreign corporations, how served.—In any suit against a foreign, private or public corporation, joint stock company or association, or acting corporation or association, citation or other process may be served on the president, vice president, secretary or treasurer, or general manager, or upon any local agent within this State, of such corporation, joint stock company or association, or acting corporation or association."

By the act of March 13, 1905, General Laws of Texas, 1905, p. 30, an additional method of serving foreign corporations was provided as follows:

"SEC. 2. That service may be had on foreign corporations having agents in this State in addition to the means now provided by law by serving citation upon any train conductor who is engaged in handling trains for two or more railway corporations, whether said railroad corporations are foreign or domestic corporations, if said conductor handles trains over foreign or domestic corporations' tracks across the state line of Texas, and on the track of a domestic railway corporation within the State of Texas, or upon any agent who has an office in Texas, and who sells tickets or makes contracts for the transportation of passengers or property over any line of railway or part thereof, or steamship or steamboat of any such foreign corporation or company.

"SEC. 3. For the purpose of obtaining service of citation on foreign railway corporations, conductors who are engaged in handling trains and agents engaged in the sale of tickets or the making of contracts for the transportation of property as described in sec. 2 of this act, are hereby designated as agents of said foreign corporations or companies upon whom citation may be served."

It is settled by the decisions of this court that foreign corporations can be served with process within the State only when doing business therein, and such service must be upon an agent who represents the corporation in its business. *St. Clair* v. *Cox*, 106 U. S. 350; *Goldey* v. *Morning News*, 156 U. S. 518, 521, 522; *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406.

It is contended upon the part of the plaintiffs in error that the Pacific Company was doing business in the State of Texas, because of a partnership arrangement with the Gulf Company, or because the latter company was the agent of the Pacific Company, or, as it is sometimes said, the representative of the Pacific Company in the State of Texas. As to the question of partnership, we do not think this record presents a question of that sort. The suit is not for a partnership liability. It is an action upon a single cause of action for the tort of the Pacific Company. Service is not had by serving one partner. The real contention is that the service reaches the Pacific Company because of the agency or representative character of the Gulf Company.

Is it true that the Gulf Company was the agent of the Pacific Company or its mere creature in such a sense that to serve it is equivalent to serving the controlling company? It is a fact that both companies had common agents and employés to a certain extent, but the record shows that such employés were paid in proportion to the business done for each company. And that while in the service of the companies respectively they were under the exclusive management and control of the company in whose service they were engaged, with no

power to discharge or employ, the one company for the other; and that, although the service was in a sense common, it was kept distinct and separate in the control and payment of the employés while in the separate service of the respective companies.

It is true that the Pacific Company practically owns the controlling stock in the Gulf Company, and that both companies constitute elements of the Rock Island System. But the holding of the majority interest in the stock does not mean the control of the active officers and agents of the local company doing business in Texas. That fact gave the Pacific Company the power to control the road by the election of the directors of the Gulf Company, who could in turn elect officers or remove them from the places already held; but this power does not make it the company transacting the local business.

This record discloses that the officers and agents of the Gulf Company control its management. The fact that the Pacific Company owns the controlling amounts of the stock of the Gulf Company and has thus the power to change the management does not give it present control of the corporate property and business. *Pullman Palace Car Company* v. *Missouri Pacific Co.*, 115 U. S. 587, 597.

In *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406, suit was brought upon a contract with the Mathieson Alkali Works. The defendant had designated no agent upon whom summons could be served, and service was made upon two members of the board of directors resident of the city of New York. Upon motion made to set aside the service of summons a reference was directed to ascertain whether the defendant corporation was doing business in the State of New York. The master reported, among other things, that the defendant had operated a plant at Niagara Falls, but had conveyed all its property to another corporation organized under the laws of Virginia. That the consideration expressed for the conveyance was $1.00 and other valuable consideration, but the substantial consideration was the entire capital stock of the

grantee, the Castner Electrolytic Alkali Company. That the business of the defendant since said transfer was carried on in Providence, where it had its principal place of business. The master found that the company at the time of attempted service was not doing business in New York. Of the effect of the transfer of the entire stock of the new company to the defendant the master found: "The fact that it held the entire capital stock of the Castner Electrolytic Alkali Company, and that the operations of that company were carried on under the same management as before December 31, 1900, is not material. The new corporation was a separate legal entity, and, whatever may have been the motives leading to its creation, it can only be regarded as such for the purpose of legal proceedings. It was that corporation alone which transacted any business in this State, notwithstanding it may have been for all practical purposes merely the instrument of the defendant corporation. *People* v. *American Bell Telephone Co.*, 117 N. Y. 241; *United States* v. *American Bell Telephone Co.*, 29 Fed. Rep. 17."

Upon exceptions the master's report and conclusions were affirmed and the service set aside. That judgment was affirmed in this court. In the course of the opinion, Mr. Justice McKenna, speaking for the court, coming to deal with the effect of the transfer to the Castner Company, said: "The defendant was competent to convey its property to the Castner Electrolytic Alkali Company and afterwards make the locality of its own business Providence and Saltville. Whether the transfer to the latter company was fraudulent we certainly cannot decide from this record, and the by-law which provided for a monthly meeting in New York could not of itself keep the corporation in New York. The testimony is positive that no business of the corporation was done in New York city after the transfer of the Niagara Falls plant; that all of the business of the corporation was conducted at Providence, except of a purely manufacturing character, which was conducted at Saltville."

So, in the case at bar, notwithstanding the ownership of the stock in the Gulf Company by the Pacific Company, the former company transacts the business in Texas, and is a separate legal entity, authorized under the laws of Texas and legitimately carrying on business there.

There is no evidence that the Pacific Company may not lawfully hold the stock of the Gulf Company, and under the statute of Illinois it seems to be authorized so to do. Starr & Curtis, Ill. Stat. vol 3, p. 3229. It is true that the Pacific Company loaned the money to build the road of the Texas Company, predecessor of the Gulf Company. But as was well observed by Judge (afterwards Justice) Jackson in *United States* v. *American Bell Telephone Company*, 29 Fed. Rep. 17: "For one person to supply means for another to do business on is not the doing of that business by the former."

The conduct and control of the business in Texas was entrusted to the Gulf Company. As the largest stockholder the Pacific Company had an interest in that business, but a separate corporation had been legally created in Texas, with authority to make contracts and control its own affairs and carry on its own business. This separate corporation had its own officers, a large amount of its own property, was responsible for its contracts and to persons with whom it dealt.

Nor do we think that the persons served with process are agents of the Pacific Company doing the business of the company in Texas. Section 2 of the act of March 13, 1905, Laws of Texas, 1905, p. 30, is very broad, and would seem to comprehend conductors who handle trains for two or more corporations over foreign or domestic roads across the state lines of Texas and on the track of a domestic railroad within the State of Texas, or upon any agent who has an office in Texas and who sells tickets or makes contracts for the transportation of passengers or property over any line of railroad or part thereof, of any such foreign corporation or company; and such companies and agents by section 3 of the act are made agents of the foreign corporation or company, upon whom the cita-

tion may be served.   But it is essential to the validity of such service . that the corporation shall be doing business within the State, and that the service be upon an agent representing the corporation with respect to such business.   *Goldie* v. *Morning News,* 156 U. S. *ubi sup.; Conley* v. *Mathieson Alkali Co.,* 190 U. S. *ubi sup.*

The conductors, one of whom was served, when he crossed the Texas line, this record shows, became the servant and agent of the Gulf Company. ' The ticket agent sold tickets for the Gulf Company, in whose employment he was.   He would also sell tickets good upon its line, and over the lines of the Pacific Company, but he transacted this business as the agent of the Gulf Company.   As to Hovey, the record fails to show that he was agent of the Pacific Company; on the contrary, it shows that he had no connection with the company, and that his duties were confined to the affairs of the Gulf Company. The same is true of Merrell; and as to Sebree, the record shows that for the services rendered as trainmaster he was paid by each company for the service performed for it and had no charge as agent of the business of the Pacific Company in the State of Texas.

. We reach the conclusion that the Pacific Company was not doing business in the State of Texas and that the attempted service was not upon agents of that company transacting its business in that State in such a sense as to give jurisdiction by service of citation upon them.   The judgment of the Circuit Court is

*Affirmed.*

Dissenting: The CHIEF JUSTICE and MR. JUSTICE MOODY.