## BALLARD & BALLARD CO. v. MUNSON S. S. LINE.

Circuit Court of Appeals, Sixth Circuit.
April 3, 1928.

No. 4816.

1. **Corporations** ☞662—State court held without jurisdiction of action against steamship line not "doing business" within state, notwithstanding that it dealt with shippers within state through railroad.

State court *held* without jurisdiction of action against steamship line for negligent destruction of goods, on ground that defendant was not "doing business" within state, notwithstanding that it advertised to shippers that they might procure, within state, through bills good over its line, and procured railroad officials to issue such bills of lading, and obtained shippers' consent to conditions in bill of lading covering voyage already contracted for outside of state and before issuance of bill of lading.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

2. **Courts** ☞508(3)—Federal courts may enjoin enforcement of state court judgment void for lack of jurisdiction.

Federal courts have power to enjoin party from enforcing judgment obtained in state court under circumstances making it void for lack of jurisdiction.

Appeal from the District Court of the United States for the Western District of Kentucky; Charles I. Dawson, Judge.

Suit by the Munson Steamship Line against the Ballard & Ballard Company. From an order enjoining defendant from enforcing a judgment obtained in a state court, it appeals. Affirmed.

Frank M. Drake, of Louisville, Ky., for appellant.

Shackelford Miller, Jr., of Louisville, Ky. (Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, on the brief), for appellee.

Before DENISON and MACK, Circuit Judges, and MOINET, District Judge.

MACK, Circuit Judge. Appeal from an order enjoining defendant from enforcing a judgment obtained by it against the plaintiff in the Kentucky circuit court, on the ground that the state court was without jurisdiction of the cause of action.

In June, 1916, defendant shipped merchandise from Kentucky to Cuba over the Louisville & Nashville Railroad to Mobile, Ala., and thence by plaintiff's line to Cuba. The bill of lading, signed, "J. J. Dignan, Geny. Agent," recited, "the agent signing on behalf of the said Louisville & Nashville Railroad Co. and of the said Ocean Steamship Company, or Ocean Steamer, and her owner, severally and not jointly." The bill contained a large number of printed conditions—the first group "with respect to the service until delivery at the port"; the second, "with respect to the service after delivery at the port first above mentioned." The port in each case was Mobile, and the sets of conditions were applicable, respectively, to the railroad and to the steamship transportation. One of the second group conditions provided: "That the property covered by this bill of lading is subject to all conditions expressed in the regular forms of the bills of lading in use by the steamship company at the time of shipment, and to all local rules and regulations at the port of destination not expressly provided for by the clauses herein."

The goods, while awaiting reloading in Mobile, were destroyed by plaintiff's alleged negligence. In the action in the state court against the railroad and the steamship line, service was had upon J. J. Dignan the signer of the bill of lading, and upon J. H. Bywater, foreign freight agent of the railroad. The case was dismissed on the merits as against the railroad. The Munson Line did not appear, and a default judgment was entered against it. On the hearing in the District Court, it appeared that the Munson Line had no offices or employees of its own in Kentucky; that for over 20 years the usual course of business with defendant and other local shippers had been as follows: The shipper, or the railroad's foreign freight agent at the shipper's request, would reserve boat space through correspondence with plaintiff's New York or other seaboard office, and would present this reservation with the freight to the railroad agent, who then issued a bill of lading as above described. At that time the shipper would prepay railroad and steamship charges. When the freight reached Mobile, the railroad company would give the Munson Line its share of the money, together with a copy of the bill of lading, whereupon an ocean bill of lading would be issued and attached to this copy. The shipper did not see this ocean bill and often would not know of its existence, though he could get a copy on request.

The evidence was that the Munson Line's only interest in the bill of lading was for purposes of identification and for the information therein contained, that the line considered itself bound only by "the contract of affreightment" previously made at its own office, and that occasionally the bills of lading were never received, or destroyed when received, or disregarded by both the ocean carrier and the consignee of the freight. The testimony further showed that, while the railroad sometimes issued a bill of lading "severally but not jointly" although no reservation of ship space at the New York office had been made, it did this without the express authority and against the instructions of the Munson Line; the line did not deem itself bound to accept such a shipment. It treated it as it did other goods tendered without contract; that is, to be loaded when there should be room. On the other hand, bills of lading issued by the railroad usually and for part of the shipment in the instant case, pursuant to a reservation, were "accepted as the document under which the material was to be handled," so far as it was consistent with the prior booking.

It further appeared that the Munson Line sent sailing cards to large shippers throughout this territory, on the reverse of which was printed:

"*Through bills of lading issued and through rates quoted * * * in connection with * * * Louisville & Nashville R. R.*"

And also:

"For rates and further particulars apply to * * * J. A. Bywater, foreign freight agent, Louisville & Nashville R. R."

At the time of the trial, Dignan was dead. Bywater testified that both he and Dignan were employees of, and received their entire salary from, the railroad, that the Munson Line had no control over their employment, and that they always considered themselves as acting for the shipper in arranging for cargo space. The general freight agent of the Munson Line, in his testimony, denied their agency for the line, stating that it had always been immaterial to the line which of the railroad officials signed the bills of lading. It further appeared that neither Dignan nor Bywater had ever informed the Munson Line of the service on them, except that, as Bywater testified, he had mentioned the matter in an informal way during a conversation with the general freight agent at some time which he could not recollect, possibly after the default judgment had been rendered. According to the testimony of the Munson Line official in charge of claims, his office had received no information that the action had been brought until October 17, 1924, eleven days after the judgment by default, which, under Kentucky law, became final in sixty days.

[1] Defendant stresses two activities of plaintiff: (1) Advertising to Kentucky shippers that they might procure in Louisville through bills good over its lines. (2) Procuring railroad officials to issue such bills of lading, on behalf of the carriers "severally but not jointly," and to collect money therefor. Certainly these activities benefited the Munson Line, and in a sense may be considered the doing of business in Kentucky. But, in view of Peterson v. Chicago, R. L. & P. R. R., 205 U. S. 364, 27 S. Ct. 513, 51 L. Ed. 841, Green v. Chicago, B. & Q. R. R., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916, General Investment Co. v. Lake Shore & M. S. Ry., 260 U. S. 261, 43 S. Ct. 106, 67 L. Ed. 244, and especially Philadelphia & R. Ry. v. McKibbin, 243 U. S. 264, 37 S. Ct. 280, 61 L. Ed. 710, these activities cannot be deemed such a doing of business in Kentucky as to subject the line to the jurisdiction of its courts.

Shipments of Kentucky goods for which space had not been reserved beforehand clearly did not involve the Munson Line's doing business in Kentucky. The testimony is convincing that the line had no connection with such goods until it accepted them, as space permitted, in Mobile. While they arrived under through bills purporting to be issued in part by the steamship company, the issuance of such bills was plainly unauthorized. The Munson Line was not required to discontinue its relations with the railroad on this account in order to rebut any presumption of apparent authority; its method of dealing with such goods on arrival at Mobile sufficed therefor.

Under the evidence, the New York reservations were booking contracts; the major terms of the shipment, rate, amount, and time of sailing were all thereby contracted for outside of Kentucky and before the issuance of the bill of lading. Granting defendant's contention that the acceptance of the bill of lading was necessary to bind shippers by the conditions printed therein and others incorporated by reference, since the shippers would not be bound by the later ocean bill which they never received and of which they often had no knowledge, nevertheless, in our judgment, the obtaining in Kentucky of shippers' consent to conditions in a bill of lading covering a voyage already contracted for, is not such an activity as under the authorities constitutes doing business within the state. In St. Louis S. W. Ry. v. Alexander, 227 U. S. 218, 33 S. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1915B, 77, not only were claims settled by authority in the state, but all the surrounding circumstances were stronger than in the instant case. The Munson Line did not employ persons or maintain an office in the jurisdiction, as the St. Louis Southwestern Railway did. Its solicitation was merely by correspondence. It had no freight or passenger agent acting on its behalf, although the Louisville and Nashville officials performed services on behalf of the shippers. There was nobody in Kentucky who could *negotiate* for it and make adjustments; at most, it authorized railroad officials to sign a predetermined form. And, finally, the bills of lading could not be effectively issued without a previous extrastate contract. Giving to the "severally, but not jointly," clause, and to the exempting conditions to which it refers, all due weight, the case is not perceptibly stronger than those hereinabove cited, which protect connecting carriers against actions in the state wherein the through tickets are sold. Cone v. New Britain Mach. Co. (C. C. A.) 20 F.(2d) 593, is clearly distinguishable. The circumstances attending the service of process and rendition of judgment by default in the present case well illustrate the dangers of extending the jurisdiction.

It becomes unnecessary to inquire whether, if the plaintiff were doing business in Kentucky, service was made upon a proper agent.

[2] The power of federal courts to enjoin

a party from enforcing a judgment obtained in a state court, under circumstances making it void for lack of jurisdiction, is of course well settled. Simon v. Southern Railway, 236 U. S. 115, 35 S. Ct. 255, 59 L. Ed. 492.

Decree affirmed.