WALTER M. TOOLE COMPANY, INC., Appellant, v. DISTRIBUTORS GROUP, INC., Appellee.

No. 41838.

DECEMBER 12, 1933.

Chester J. Eller, for appellant.

Carr, Cox, Evans & Riley, for appellee.

STEVENS, J.—The plaintiff is an Iowa corporation and the defendant a New York corporation. The cause of action arose out of an alleged breach of a contract to exchange certain shares of corporate stock. The merits of the cause of action are not before us. Original notice was served upon the secretary of state. This was followed by a special appearance by the defendant, challenging the jurisdiction of the court to proceed under this notice. Subsequently, a new original notice was served upon Harry Polk as president of the Polk-Peterson Corporation, alleged state agent for the defendant. Defendant thereupon filed an amendment to its prior special appearance again challenging the jurisdiction of the court. The sufficiency of the service of one or both of the said original notices to confer jurisdiction presents the sole question for review on this appeal.

Each of the parties to this action and Polk-Peterson Corporation are engaged in the business of selling securities. Polk-Peterson Corporation has and maintains an office for the conduct of its business in the city of Des Moines. Appellee had made proper designation of the secretary of state as a person upon whom process might be served for the violation of the Iowa Securities Act.

The questions in the case are not easily disposed of. It is necessary at this point that the precise relationship between appellee and the Polk-Peterson Corporation be ascertained and defined. This is the controlling question in the case. The contract between them is in writing and of considerable length. We quote therefrom as follows:

"Distributors Group, Incorporated, Sponsors of North American Trust Shares, a fixed trust, more fully described in the attached offering circular, through its Board of Directors, invites you to become a member of the Distributors Group, of which Distributors

Group, Incorporated, is the Manager and through which it derives a profit, in accordance with the following terms and conditions:

"OFFERING PRICE: The retail offering price of North American Trust Shares is based upon and varies with the market quotations of the underlying stocks on the New York Stock Exchange. Complete details appear in the offering circular. In all cases where wholesaling is permitted the standard commissions and allowances to sub-dealers, as outlined in the current Selling Group Agreement, shall prevail and shall be maintained by the Group Members.

"NOTIFICATION OF PRICE CHANGES: Notification of price changes will be sent to each Group Member. No liability will attach to the . Manager through errors or delays on the part of the telegraph or telephone companies in the transmission of price changes. Large orders should be placed by telephone (Whitehall 4—8840) in order to secure prompt confirmation on days of unusual market activity. The price prevailing at the time the Group Member's order is received by the Manager shall determine the confirmation price. The manager shall pay the cost of telegrams and telephone messages giving notice of price changes and confirming orders. Group Members shall pay the cost of telegrams and telephone messages when placing orders or requesting information.

"COMMISSIONS: Commissions per trust share sold by Group Members shall be 5⅛% of the corresponding commission base price. The commission base price, as herein referred to, consists of the market value of the underlying stocks per trust share including odd lot premiums and brokerage commissions, plus or minus the amount per trust share of any adjustment to the next higher or next lower one-eighth point. This commission base price will appear on the written confirmations. Group Members will receive as a part of this 5⅛% commission ¼% of the corresponding commission base price of North American Trust Shares in newly issued stock of Distributors Group, Incorporated. The present rate is five (5) shares of the capital stock of Distributors Group, Incorporated, for each full unit of two thousand (2,000) North American Trust Shares, sold by said Group Member and/or by subdealers of his origination. The number of shares of Distributors Group, Incorporated, capital stock so issued shall be determined from time to time by the Board of Directors or the Executive Committee of Distributors Group, Incorporated. * * *

"ADVERTISING: In addition to the foregoing commissions, the

Group Member will be credited on every trust share sold with ⅛ of 1% of the corresponding commission base price as an advertising allowance and against this credit may be charged the cost of literature and newspaper, postcard, form letter or other advertising. An itemized statement of expenditures with copy of advertisements attached must be presented by the 10th day of each month, following the month in which the expenditures are made. Unused advertising credits may be carried forward from month to month but must be used during the calendar year. The right is reserved to settle advertising claims of subdealers on the basis of the Group Member's report of such sales. A complete series of advertisements and mats will be available to all Group Members at cost. Copy which has been specifically approved by the New York Stock Exchange will be so designated. Group Members shall not advertise or use any circulars regarding the trust shares in any way contrary to the rules or regulations of the New York Stock Exchange relating to fixed investment trusts. Group Members shall not include in any advertisement or circular relating to the trust shares any statement tending to suggest that such trust shares have been approved in any manner by that Exchange. Group Members shall submit to the Manager all circulars and advertisements of like nature, which have not been furnished to the Group Member by the Manager, before they are used by the Group Member in connection with the trust shares. The right is reserved to change or discontinue the advertising allowance at any time. * * *

"REPURCHASES: Group Members shall maintain a repurchase market at the prevailing bid price on trust shares distributed by them, so long as the Manager provides a secondary market. The Manager will provide a secondary market for Group Members but will be under no liability for failure or refusal so to do. Under the Trust Agreement provision is made for holders of North American Trust Shares to convert holdings into cash through the Trustee and to convert one-quarter units (five hundred (500) trust shares) and multiples thereof, into the underlying stocks and the other property held by the Trustee applicable thereto, less certain expenses as stated in the Trust Agreement. Quotations on North American Trust Shares will be furnished to leading newspapers throughout the country. * * *

"REPORTS: On the first business day of each month Group Members having wholesale rights shall send to the Manager a com-

plete report of the sales made by them and their sub-dealers during the previous month, this report to consist of:

(a) Total number of trust shares sold at retail by the Group Member and the total dollar volume of such retail sales at the full retail price (not the commission base price).

(b) The names of the Group Member's sub-dealers, the total number of trust shares sold by each sub-dealer and the total dollar volume at the full retail price (not the commission base price) of such sales made by each sub-dealer.

(c) Group Members selling at retail and/or at wholesale in more than one State, shall show the total number of trust shares and the total retail dollar volume sold in each state.

"The figures in these monthly reports shall be accepted as being correct and final in determining the distribution, in accordance with the terms of the current Selling Group Agreement, of the capital stock of Distributors Group, Incorporated, to the sub-dealers, and the Group Member will protect the Manager in so doing and for all other purposes under this Agreement."

The statute applicable to the facts before us is section 11079, which is as follows:

"When a corporation, company, or individual has, for the transaction of any business, an office or agency in any county other than that in which the principal resides, service may be made on any agent or clerk employed in such office or agency, in all actions growing out of or connected with the business of that office or agency."

It is the contention of appellee that it has at no time had or maintained an office or agency in the state of Iowa, and that the transaction out of which this action grows did not arise out of or in connection with any business of the agency of Polk-Peterson Corporation, if any such relationship existed at the time of the service of the original notice. The foregoing statute has been construed to apply to nonresident corporations (Davidson v. Henry L. Doherty & Co., 214 Iowa 739, 241 N. W. 700), so that the vital and determinative questions in the case are: Was Polk-Peterson Corporation the agent of appellee in the state of Iowa and, if so, did the cause of action grow out of a transaction connected with the business of such agency? The question as to the exact relationship between appellee and Polk-Peterson Corporation is by no means easy of satisfactory

solution. There is apparent a very definite effort on the part of appellee to so phrase the contract involved as to avoid a possible holding by any state court that one dealing with it in the manner recited in the contract and shown in the evidence is an agent within the meaning of state statutory provisions providing for the service of summons on nonresident corporations.

The Supreme Court of the United States in Chicago Board of Trade v. Hammond Elevator Co., 198 U. S. 424, 25 S. Ct. 740, 49 L. Ed. 1111, was confronted with a similar question.

The method of doing business between the appellee Polk-Peterson Corporation is detailed in the written contract and shown by the testimony of Polk. Polk is a director of appellee corporation. Polk-Peterson Corporation maintains an office at their own expense in the city of Des Moines. No part of the expenses of the business, except as indicated in the contract, is borne or contributed to by appellee. The Iowa corporation is not authorized to transact business in the name of appellee nor to bind it in any way by contract. Shares of stock sold by Polk-Peterson Corporation and by the subdealers in the state of Iowa are forwarded by appellee to a bank, with sight draft attached, to be delivered upon the payment of the draft. Subdealers are in no respect under the direction or supervision of Polk-Peterson Corporation, but are created by direct act of appellee. Both appellee and the Polk-Peterson Corporation are interested financially in the distribution of securities by subdealers. Representatives of Polk-Peterson Corporation, when convenient, call upon subdealers for the purpose of conference and to aid them in their business. No right of supervision, however, over subdealers exists, and none is assumed by its representatives. Polk testified that he is paid a commission of one-half of 1 per cent upon all North American Trust shares distributed in his territory for overwriting. The territory of Polk-Peterson Corporation includes Iowa and Nebraska, and it is authorized to sell at wholesale in such territory. Once each month a remittance of all commissions due Polk-Peterson Corporation is made by appellee to it. The record does not quite fully disclose the exact method by which sales of securities are made, but it does appear that, when Polk-Peterson Corporation have negotiated the sale of a quantity of North American Trust shares, request is made of appellee for the amount thus sold. In due time the requisite number is forwarded to a bank in the City of Des Moines, with sight draft attached, which sight draft must be

paid before the stock is delivered. The contract provides that "Group members shall not be partners with each other nor with the manager." By signing a form of acceptance printed on the contract, Polk-Peterson Corporation became a member of the Distributors Group. As stated, Polk is a director of the appellee corporation. The question as to whether a foreign corporation has entered the state for the purpose of doing business therein is reviewable by and must be determined under the laws of the United States and the decisions of the Federal Supreme Court. American Asphalt Roof Corp. v. Shankland, 205 Iowa 862, 219 N. W. 28, 60 A. L. R. 986; Reliance Motor Co. v. Craig, 206 Iowa 804, 221 N. W. 499; Burnham Mfg. Co. v. Queen Stove Works, 214 Iowa 112, 241 N. W. 405; Peterson v. Chicago, R. I. & P. Ry. Co., 205 U. S. 364, 27 S. Ct. 513, 51 L. Ed. 841; People's Tobacco Co. v. American Tobacco Co., 246 U. S. 79, 38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537; International Harvester Co. v. Commonwealth of Kentucky, 234 U. S. 579, 34 S. Ct. 944,, 58 L. Ed. 1479.

The ultimate question in such cases for decision is one of fact, whether the law of the state or of the United States is applied. Such is the question here. If Polk-Peterson Corporation was the agent in the state of Iowa of appellee, then service of the original notice upon its president was sufficient to confer jurisdiction of the subject-matter of this case on the court. If such agency exists, this fact must be inferred from the course of dealing between the parties. The written agreement does not in terms create such relationship. It must be assumed that the contract was entered into by and on behalf of the respective parties for their mutual profit and advantage. Manifestly, both do profit by the sale and distribution of the securities referred to in the written agreement. If, by the arrangement between them, appellee and the Polk-Peterson Corporation sustained the relationship of partners, then the latter in transactions for and on behalf of the partnership would be its agent. Manifestly, the contract does not contemplate the usual and ordinary relationship of principal and agent, but the contrary. If agency exists, it arises as a matter of law from inferences to be drawn from the agreed relationship and the method of transacting business. Service upon a mere officer of a nonresident corporation has been by the Supreme Court of the United States declared to be insufficient. Conley v. Mathieson Alkali Works, 190 U. S. 406, 23 S. Ct. 728, 47 L. Ed.

1113; Kendall v. American Automatic Loom Co., 198 U. S. 477, 25 S. Ct. 768, 49 L. Ed. 1133.

Nor is the fact that compensation in the form of a commission is paid by appellee to Polk-Peterson Corporation in the course of their dealing necessarily decisive of the question. This is the necessary conclusion from the language of the Supreme Court of the United States in Board of Trade of City of Chicago v. Hammond Elevator Co., supra. Commissions were paid, under the facts of that case, to the corporation held to be an agent upon whom service of summons could be made. The court, in the course of its opinion, gave emphasis to that fact. In other words, it was treated as one among other facts and circumstances to be considered in determining the relationship. There were, indeed, many facts and circumstances in the cited case tending strongly to sustain the claimed relationship of principal and agent.

Reliance is placed upon several prior decisions of this court. Locke v. Chicago Chronicle Co., 107 Iowa 390, 78 N. W. 49; Murphy v. Development Co., 169 Iowa 542, 151 N. W. 500; Morey v. Standard Separator Co., 174 Iowa 530, 156 N. W. 719; Pugh v. Bothne Co., 178 Iowa 601, 159 N. W. 1030. Nearest in point is the case last cited. It, however, has obvious distinguishing features. The Bothne Company, dealers in Great Western automobiles, was required by its contract with the manufacturer to provide and maintain salesrooms and other conveniences for carrying out the arrangement between them. No doubt, the contract, which is copied in full in the opinion, was intended to create the relationship of seller and purchaser and not of principal and agent. The question was a close one, and the interpretation of the contract asserted by the principal might possibly have been sustained. In saying this, it is not intended to create a doubt as to the correctness of the conclusion reached, but only to emphasize the closeness of the issue involved.

The court said in Murphy v. Development Co., supra, that "We do not regard it as necessary that it be shown that defendants paid the expenses of maintaining the office" of the alleged agent. So, in this case, no single or definite fact shown in the evidence may be seized hold of and emphasized as determinative of the question involved. It must be observed that the relationship created by the contract was intended to promote the mutual benefit and profit of the parties thereto and that the adopted method of doing business results in carrying out the intended purpose. Each and all of the

parties named in the record are brokers engaged generally as independent dealers in securities.

It seems to the court that appellant has failed to sustain the burden resting upon it to prove the alleged agency. Thornburg v. Bennett & Co., 206 Iowa 1187, 221 N. W. 840. The established facts do not justify the necessary inference.

Furthermore, we think it clear that the transaction alleged in appellant's petition did not arise out of or in connection with the business of Polk-Peterson Corporation. It was initiated and concluded by wire between the respective parties thereto. This is shown by the telegrams introduced in evidence. Further discussion will not be profitable. It is the conclusion of the court that the special appearance of defendant was properly sustained by the district court and its judgment is, accordingly, affirmed.—Affirmed.

All Justices concur.