## BERGOLD v. COMMERCIAL NAT. UNDERWRITERS, Inc., et al.

### Civ. No. 4860.

District Court, D. Kansas, First Division.

March 29, 1945.

Arthur J. Stanley, Arthur J. Stanley, Jr., J. E. Schroeder, Lee E. Weeks, and Leon-

ard O. Thomas, all of Kansas City, Kan., for plaintiff.

C. O. French, of Kansas City, Mo., and Melvin E. Buck, of Kansas City, Kan., for defendants Commercial National Underwriters, Inc. and Commercial Bankers Mutual Casualty Co.

HELVERING, District Judge.

This is an action by Mary Bergold, a resident of Kansas, against the Commercial Bankers Mutual Casualty Company, Commercial National Underwriters, Inc., and the Rosedale Bath and Hotel Company, all Missouri corporations, for damages for the wrongful death of plaintiff's husband who died on December 13, 1942, from burns caused by steam used in giving deceased a turkish bath on the premises of the last-named corporation in Kansas City, Kansas.

On the 27th day of October, 1943, none of the defendants having appeared, answered or otherwise plead, default was entered and judgment taken against all three. A motion to quash service of process was filed on behalf of the Commercial National Underwriters, Inc. and the Commercial Bankers Mutual Casualty Company on January 31, 1944, and subsequently overruled; but, on motion of plaintiff, the default judgment was vacated and set aside as to these two defendants. They then answered, again attacking the service in the action. The question now before the Court is whether or not these two parties were properly and effectively served with process so as to render them subject to the jurisdiction of this Court. Depositions were submitted and hearings were held on the 19th, 22d, and 24th days of May, 1944, in Kansas City, Kansas, at which further testimony and documentary evidence were introduced.

The service of summons which is now under attack was had upon one J. W. Pierce in Kansas City, Kansas, on September 18, 1943, as manager for each of the defendants. It seems not to be seriously disputed that Pierce was employed, in whatever capacity and for whomsoever he actually served, by a Sam Hudson, whom it is agreed was ostensibly at the time the President of the defendant Rosedale Bath and Hotel Company, although he could not legally have been such under the Missouri law since he owned no stock in the corporation. The problem resolves itself into the question whether Sam Hudson was actually functioning for either or both of the other two defendants and whether, as a consequence, either or both of them were doing business in the State of Kansas so as to render themselves amenable to process here. The capacity of Pierce as a proper agent for receipt of service is also challenged.

From a careful analysis of the evidence, it is obvious that either Sam Hudson acted solely for the Rosedale Bath and Hotel Company and no other or the organization of that company and the Commercial National Underwriters, Inc. by those interested in the Commercial Bankers Mutual Casualty Company, and the subsequent manipulation of these interests, was one of the most cunningly devised and executed schemes to create paper assets for an insurance company and to operate, ultra vires, the business of a third corporation in a foreign state without domestication and with immunity from legal responsibility which this Court has had opportunity to examine.

Whatever kinship may exist between these three corporations springs from the motherhood of the Commercial Bankers Mutual Casualty Company, hereinafter designated C B C. Commercial National Underwriters, Inc., hereinafter referred to as C N U, was admittedly organized as an agency company of C B C, although its authority to act other than in connection with the sale of C B C policies is denied. C B C's control of C N U is not questioned, although C B C was not a stock company and the identity of its owners and the shareholders of C N U is not patent. Both were known as the "Garrett companies", the reference being to a Mr. T. W. Garrett. The maternity, if such existed, of C B C to the Rosedale Bath and Hotel Company, hereinafter called Rosedale, is predicated upon the manner of Rosedale's organization, the issuance and disposition of its bonds and the subsequent efforts of the individuals interested in C B C and C N U to protect that bond issue.

Jacob Baum, on the organization of Rosedale, contributed the property at 301 South Mill Street, Kansas City, Kansas, for which he received $22,500 of the Rosedale bonds and $5,000 in cash which was paid by C B C for an equivalent amount of bonds with earliest maturity dates. The total of this consideration, $27,500, had apparently been Baum's asking price on the property, but an appraisal of over $134,000 was obtained and a total of $65,000 in bonds issued. Of this bond issue, C B C received certificates representing $42,500

indebtedness for which it gave $6,000 and a surplus note in the amount of $36,500. One thousand dollars of the cash was paid to Dr. Herman S. Majors, to whom that amount of bonds were purportedly issued and by whom, it is claimed, they were sold to C B C, although Dr. Majors testified that he had never held any of the bonds.

Majors was a Missouri physician who thought he saw financial opportunity in the property and sought assistance in developing it. He considered himself at least one of the organizers of the Rosedale corporation and was named its first president. The $36,500 surplus note, it is claimed, was issued to Majors, although it seems agreed that he could only have held it for the benefit of the Rosedale corporation. Nevertheless, it is also claimed that he assigned it, without authorization of Rosedale's directors or stockholders, either to C B C to secure his own personal agreement to repurchase the bonds it had bought from him or to C N U to secure it in an alleged guarantee of the bonds held by Baum. Since Majors could not even recall the existence of this note or the issuance of any bonds to him, it is probable that all of these transactions took place at the same time as component elements of a single arrangement, and that Majors, whether aware of it or not, was used by someone as a figurehead. It is likewise rather obvious that the bonds obtained by C B C, with the exception of the $5,000 worth which were the first-maturing bonds of the issue, were actually of little value since the other $22,500 worth of bonds which were held by Baum had earlier maturity dates and could have been first foreclosed against a property of a probable value of little more than that amount; but, tout ensemble, they did give the appearance on the books of C B C of $42,500 of assets, and this at the very modest expense to C B C of only $6,000.

It is just as apparent that the bonds and not the shares of corporate stock represented the real ownership and control of the Rosedale company. The company was capitalized for one hundred thousand dollars. Shares in the amount of $60,000 were issued at a par value of $10 each. Six hundred and twenty-eight shares were issued to the Major Clinic, approximately $3,500 of whose money Dr. Majors had used in repairing the property on South Mill Street; no other consideration was paid for these shares. Four qualifying shares each were issued to two parties who were named directors and the rest of the stock, approximately five thousand three hundred and sixty-two shares, was issued to Dr. Majors. These transactions took place in the early part of 1942.

In about September of the same year, when Dr. Majors discovered that he could not profitably operate the bath house enterprise and was ready to "turn the whole thing back and take a loss", he handed over all of his stock intending to turn it "back to the people who had loaned the money, back to the insurance company" and obtained a written release from all liability from "one of Mr. Garrett's companies". This transfer also was made without consideration. Dr. Majors apparently paid nothing for his stock and considered it practically worthless. The other directors paid nothing for their qualifying shares and there is no suggestion that they ever took their ownership seriously enough to attempt to exercise any of the prerogatives of stockholders and no convincing proof that a directors' meeting was ever held. In any event, at the time of the death of plaintiff's husband and at the date of service of process upon Pierce there were no outstanding shares of stock other than the qualifying shares in the hands of two directors and three hundred and twenty-eight shares of that issued to the Major Clinic. Dr. Majors testified that all of the stock held by the clinic was turned back at the time he gave up his own stock but the company records and stock book were apparently not allowed to fully reflect this transfer. No consideration had ever passed for any of the stock except that issued to the clinic and Dr. Majors did not bother to take possession of either his stock or bond certificates. When bonds in double the amount of the probable value of all assets were outstanding and stock shares in the face amount of $60,000 represented a real investment of only about $3,500, the inclination of all interested to ignore the stock as indicia of ownership is easily comprehended.

In the spring or summer of 1943, before the disputed service upon Pierce was made, C. O. French, then president of C B C, proposed a rearrangement of the Rosedale bond and stock issues under which Baum was to cancel $15,500 of his bonds, transfer $5,000 of his remaining bonds to C B C to take the place of an equivalent amount of bonds to be cancelled by C B C, leaving him bonds in the amount of $2,000. For these cancellations and transfers Baum was

to receive as consideration all of the capital stock of the Rosedale corporation except that held by the Major Clinic and such shares as might be used to settle open accounts at the rate of $10 per share. This would have left Baum holding practically all of the stock but only $2,000 of the bonds while C B C would have retained its original amount of bonds. No consideration could have accrued to Rosedale other than the very doubtful advantage of having its bond issue reduced from $65,000 to $44,500 which would have been only $17,000 above the probable value of its assets. It was to receive no payment for the transfer of practically all of its stock from its own treasury unless the transfer of approximately $56,720 par value of stock was proper consideration for a reduction of $20,500 of its bond issue when outstanding bonds would have still greatly exceeded the probable value of the assets. All real advantage would have redounded to the benefit of C B C which then could have marshalled all of the assets for the payment of its bonds—which represented an investment of only $6,000 since it then had possession of the surplus note either directly or through the agency company. It is not difficult to understand why this proposed rearrangement was never consummated. The significance of this proposal is that French, as president of C B C, was able to give assurances of its acceptance by Rosedale and that Sam Hudson consented to the proposal. Sam Hudson could only have been acting for the insurance company since Rosedale would not have benefited from the transaction.

There can be little question but that at the time of French's proposal for the rearrangement of the Rosedale bonds and stock, the bondholders were actually in control of the bath house corporation. This relationship is more clearly demonstrated when one considers the part which an attorney, John Hudson, brother of Sam Hudson, the second president of Rosedale, played in the organization and financial engineering of the three defendant companies.

John Hudson apparently acted as attorney for the organization of C B C, C N U, and Rosedale. He seems to have acted throughout for Garrett and the Garrett companies. It seems to have been at the instance of Mr. Garrett or his companies that he handled the issuance of the Rosedale bonds. At no place in the evidence is there any clear indication that John Hudson had any interest in any of these transactions other than as attorney for Garrett or the two insurance companies. That he was organizing Rosedale for the benefit of and at the instigation of these interests is evidenced by the fact that Majors, who had initiated the organization of the bath house corporation and was its first president, did not even comprehend the nature of the organization or understand why the bonds were issued in the amount they were, what became of the bonds, nor could he remember accepting or transferring the $36,500 surplus note. At the time of Rosedale's organization John Hudson was so completely in command of the arrangements for all of the defendants herein that he handled not only the issuance and transfer of the bonds but issued Rosedale stock at will. At the time he accepted return of Majors' Rosedale stock Hudson gave him a release by the insurance company from all personal obligations in connection with the enterprise. Hudson was not paid for his services by Majors, individually or as president of Rosedale, and was apparently not paid at all by Rosedale unless he issued himself Rosedale stock. It is clear that Majors was used as a straw figure as was the Rosedale corporation itself.

Mr. Garrett and a Mr. Dubach, at the time president of C N U, were present at the organization of Rosedale when Dubach told Majors that John Hudson was "their attorney". The evidence shows that on the resignation of Majors as president of Rosedale John Hudson told Sam Hudson that he'd have to "take over" the Rosedale company and that "they" would make him president, which was done apparently without vote of the directorate. If Majors thought he was the real organizer of Rosedale, he was deceived; this company was organized by and for the Garrett companies through John Hudson. As has been indicated before, it is not disputed that Pierce, who was served in this action as a representative of the complaining defendants, was employed by Sam Hudson; neither is it disputed that both Sam Hudson and Pierce were managing the operation of Rosedale, although the complaining defendants contend that Sam Hudson's activity had ceased and that Pierce was acting for Baum at the time of service.

Sam Hudson, not being a stockholder of Rosedale and receiving no compensation from that company, was obviously acting for some one or some company other than himself or Rosedale. Majors having

removed himself from the picture and the remaining two stockholders (holding only qualifying shares) having never availed themselves of stockholders' rights, there actually existed no interests which Sam Hudson could have represented other than the Garrett interests.

Rosedale was doing business in Kansas but since the only remaining stockholders were Missouri residents, held only token shares, and did not consider themselves owners of the company or exercise the powers of ownership, it could only have been the bondholder, C B C, and its agent C N U which were actually doing business in Kansas. Though the agency chain was protracted, it was nevertheless effective. It was, in all probability, purposely designed to create a legally remote relationship, excellently camouflaged, but efficient enough to achieve the end desired—the creation of paper assets for C B C and the later protection of the property securing the bond issue without revealing the insurance company's real interest in its illegitimate child.

█ Should the sanction of this Court be given to such a transaction and the parent company and its legitimate offspring which were engaged in ultra vires acts be held not amenable to process in this jurisdiction, then the pattern would be formed whereby foreign corporations could do business in a state through fictitious corporations created by their own handiwork and evade legal liability in the state of their spurious operations. It is within the power of the Court to penetrate the screen of corporate fiction and to determine the real identity of the actor behind it. .

█ It is not sufficient to say that this action might have been instituted in Missouri for when a foreign corporation actually does business in a state it submits itself to the jurisdiction of that state to that extent and, for the convenience of the citizens of that state, should be required to answer there for acts related to that business and committed within the jurisdiction in which it has chosen to operate. This is not the usual case of a subsidiary corporation with a separate legal entity. Had there been, in the case of Rosedale, a separate entity evidenced by actual and authentic stock ownership, the Court might be inclined to view the matter differently. Even in such instance this Court would be confronted with the fact that the insurance companies were actually present in Kansas by their agents and managing the bath house properties.

█ The courts uniformly hold that a foreign corporation, in order to be amenable to process in a jurisdiction other than that of its domicile, must be doing business in such jurisdiction and that service must be effected upon an agent authorized by appointment or law to receive service. The first requisite, then, of valid service upon a foreign corporation, in the absence of consent, is that it be doing business of such nature and character within the state or district where service is attempted as to warrant the inference that it is present and may be "found" there and has, therefore, subjected itself to the local jurisdiction. The federal courts have carefully avoided the enunciation of any hard and fast rule as definitive of what constitutes "doing business". Each case must be determined upon its own facts. People's Tobacco Co. v. American Tobacco Co., 246 U. S. 79, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas. 1918C, 537.

█ While various statements are to be found in the digests and text books to the general effect that the business carried on by the corporation within the jurisdiction of service must be a part of the business "for which it was organized" or a part of the "usual", "ordinary" or "regular" business of the corporation, "a substantial part of its main business" or "the corporate business", it is not the conception of this Court that the decisions limit the type of local business which will suffice to subject a foreign corporation to local jurisdiction to that business which is within the purview of and authorized by its corporate charter or the laws of its domicile or solely to the type of business for which the corporation was organized. It would seem sufficient if it performs a substantial part of its regular business within the district of service and it is certainly not theoretically or physically impossible for a corporation to make its "regular" business of a nature differing radically from that authorized by its charter or from that for which it was organized. Though some of the state courts hold otherwise, those decisions do not establish jurisdictional requirements in the federal courts. Indeed, the validity of state laws which create process procedures and the decisions of the state courts which uphold them are finally tested by the interpretation of the

fourteenth amendment to the federal constitution as applied by the United States Supreme Court.

It is the opinion of this Court that the federal cases often cited as requiring the business done by a foreign corporation within a state other than that of its incorporation which will subject it to service of process in such state to be business performed within its corporate powers do not so hold. This conclusion has been reached through an exhaustive study and analysis of all cases cited in the digests and text-books and by the complaining defendants. It is true that in some of them what appears to be such limiting terminology has been used, but no case has been found in which it was necessary to determine this particular question, and it is believed that terms of limitation were used in most instances to distinguish the type of business necessary to subject the defendants therein to service from business performed prior to withdrawal of the corporation from its activity within the jurisdiction or from some other type of business activity which clearly would not subject the corporation to local jurisdiction. In more than a few of the cases such terms have been used as a result of somewhat careless reference to the wording of previous decisions, cited as authority, in which the courts did not attempt to determine the question now before the Court.

The term "ordinary business" as related to the question of sufficiency of service of process has been given a broad meaning by the courts and the volume of business which must be done within a jurisdiction by a foreign corporation in order to subject it to service of process there has been measured by a narrow standard. Westor Theatres v. Warner Bros. Pictures, D.C., 41 F.Supp. 757. While it realizes that many of the state courts hold otherwise, this Court is impressed with the interpretation adopted by the Iowa court in Kalbach v. Service Station Equipment Co., 207 Iowa 1077, 224 N.W. 73, 76: "The 'business' of a corporation is not confined strictly to the powers declared in the charter which created it an entity. The 'business' also involves the caring for the property which may belong to the corporation or in which it has an interest. This may be viewed as incidental to the purposes as declared in its articles of incorporation, but nevertheless it is business connected with the corporation * * *."

The complaining defendants in this case became involved in the organization of the Rosedale corporation. They held the major portion of its bonds and found it expedient to come into Kansas and operate its properties in order to protect their interests. When they came into this state and actually operated those properties they were doing business here just as effectively as they would have had they owned the properties themselves. These acts constituted no isolated transactions; they became an important phase of the business these corporations were actually carrying on and consisted of the entire business for which a separate corporation had purportedly been created.

 It has been repeatedly held that the ownership by a foreign corporation of stock of a domestic corporation will not of itself, unaccompanied by other circumstances showing that the foreign corporation was itself doing business in the state of service, subject the foreign corporation to service of process in the jurisdiction where the domestic corporation operates. People's Tobacco Co., Ltd. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas.1918C, 537; Peterson v. Chicago, Rock Island & Pacific R. Co., 205 U.S. 364, 27 S.Ct. 513, 51 L.Ed. 841; Conley v. Mathieson Alkali Works, 190 U.S. 406, 23 S.Ct. 728, 47 L.Ed. 1113; United States v. American Bell Telephone Co., C.C., 29 F. 17. The rule would apply with equal force to the mere ownership of bonds of the local corporation but its force is spent where the bondowner chooses to go beyond ordinary acts of self-protection and assumes actual operation of the business of another corporation which is clearly within the jurisdiction where process is served. The rule as to subsidiary corporations is likewise inoperative where it is shown that separate corporate entity is not maintained or that the parent corporation itself operates the business.

The Court finds as a matter of fact that the complaining defendants were doing business in the state of Kansas and concludes that such business was of a type sufficient to subject them to service of process in this district.

 The question of the type of agent which may be served with process in order to subject a foreign corporation to the jurisdiction of the court is a separate and dis-

tinct question from that of what constitutes the doing of business by the foreign corporation. It is generally required that he be a managing or general agent. In interpreting a statute setting up such a requirement, the court in Denver & Rio Grande R. Co. v. Roller et al, 9 Cir., 100 F. 738, 741, 49 L.R.A. 77, said, "it is obvious that this does not mean that it must be the general or managing agent of the corporation. The object of the service is attained when the agent served is of sufficient rank and character as to make it reasonably certain that the corporation will be notified of the service, and the statute is complied with if he be a managing or business agent of any specified line of business transacted by the corporation in the state where the service is made." It is not questioned that the complaining defendants herein were notified of the service of process upon Pierce. Sam Hudson had left Pierce in complete charge of the operation of the bath house; he was clearly the managing agent for that particular phase of defendants' business. The test of a particular agency in determining whether it is such as to render service of process on the agent valid as to the foreign corporation is often based upon the discretion or responsibility vested in the agent. In this case Pierce was apparently given the widest discretion since he was allowed to operate the business solely as his own judgment directed. The defendants rely on this fact and the fact that he was not required to account to them for the profits or expenditures as evidence that he was not their agent; but this is not conclusive as to the existence of the agency although it does indicate the degree of responsibility with which he was invested.

It is not necessary that express authority be granted to the agent to receive process. Connecticut Mutual Life Insurance Co. v. Spratley, 172 U.S. 602, 19 S. Ct. 308, 313, 43 L.Ed. 569. The court in that case stated, "It is a question simply whether a power to receive service of process can reasonably and fairly be implied from the kind and character of agent employed." The case also indicates that it is not necessary that the agent have the power to bind the company on contracts.

While it is generally held that an agency which will bind the foreign corporation as principal through service of process upon the agent cannot be one created by construction or implication (see United States v. American Bell Telephone Co., supra) it is also generally accepted that the agency may be found to exist as a matter of fact from all of the circumstances and transactions surrounding the relationship. The circumstances under which Pierce was employed and acted are of important probative value when considered in the light of the interest which the complaining defendants had in the bath house property.

This Court is not unmindful of the rule that agency cannot be established solely by extra-judicial declarations of the agent made to third parties in the absence of the alleged principal; however, a court is permitted to examine all other admissible circumstantial evidence in determining whether an agency actually exists. After a thorough examination of the evidence of this type which has been submitted the Court finds that Pierce was the agent of the complaining defendants at the time of the service upon him on September 18, 1943. It is not impressed with the contention that what transpired at the bath house on December 12, 1942, terminated the agency relationship between the insurance companies and Pierce. No contract between Baum and any of the parties was entered into at that time and Baum did not assume responsibility for the care of the property or the operation of the business. Nothing occurred then or thereafter to justify the Court in finding that Pierce's status as agent for the complaining defendants changed before service of process in this case was completed.

It is, therefore, the opinion of this Court that the Commercial Bankers Mutual Casualty Company and Commercial National Underwriters, Inc., were doing business in this district on September 18, 1943, that proper service of process in this action was had upon them by service upon their agent in this district at that time, and that they are subject to the jurisdiction of this Court for the purposes of this suit. Findings of fact and conclusions of law have been filed.