ABNEY MILLS, A CORPORATION v. TRI-STATE MOTOR TRANSIT COMPANY, A CORPORATION, AND NORTH CAROLINA NATIONAL BANK, A CORPORATION.

(Filed 23 July, 1965.)

**1. Process § 13—**

For valid service of process on a foreign corporation by service on the Secretary of State, G.S. 55-146, it is necessary that the foreign corporation must have transacted business in North Carolina and that the cause of action must have arisen out of the transaction of such business here. G.S. 55-144.

**2. Same—**

The requirement of G.S. 55-144 that a foreign corporation must have transacted business in this State in order to be subject to service by service on the Secretary of State is a liberalization of the requirement of the former statute that it must have been "doing business" here, and the decisions under the former statute are apposite, and transacting business in this State within the meaning of the statute is the transacting here of some

substantial part of the corporate business, and not merely a casual or occasional transaction, each case to be determined upon its particular facts.

**3. Same—**

Mere ownership of the controlling stock of a domestic corporation by a foreign corporation does not alone constitute transacting business here by the foreign corporation, but when the foreign corporation acquires controlling interest of a domestic corporation and through an officer or officers sent here manages and controls the affairs of the domestic corporation in the pursuit of its business here, the foreign corporation is transacting business here and is subject to the jurisdiction of the courts of this State.

**4. Same—**

A finding that the evidence failed to show that a foreign corporation was transacting business in the State during a relevant period so as to subject it to the jurisdiction of the courts of this State, *held* not a finding of fact but a conclusion of law. In order to support a conclusion in this regard the court must make specific findings supported by evidence as to the particular activities of the foreign corporation in this State in order that it can be judicially determined whether its activities were substantially continuous and systematic so as to support service on it by service on the Secretary of State. G.S. 55-144.

**5. Same—**

In an action against a foreign carrier by a nonresident plaintiff for breach of the carrier's contract to purchase the stock of a domestic corporation at a stipulated price, the foreign carrier having sent an officer into this State who temporarily managed the domestic corporation under the provisions of the contract, a finding that the cause alleged in the complaint did not arise out of any business transacted by the carrier in this State is not a finding of fact but a conclusion of law. In order to support a conclusion in this respect the court must find the specific facts in respect to the breach of the contract.

**6. Appeal and Error § 55—**

Where an order of the court is not supported by determinative findings of fact on the crucial questions presented for decision, the order must be vacated and the cause remanded for findings of fact and the entry of an order based upon such findings and the conclusions made therefrom.

APPEAL by plaintiff from *Walker, S.J.,* 23 November 1964 Civil Session, Schedule "D", of MECKLENBURG.

Civil action by plaintiff, a South Carolina corporation with its principal place of business in that State, to recover damages from defendant Tri-State Motor Transit Company, a Delaware corporation with its principal place of business in Joplin, Missouri, for an alleged breach of its contract to purchase and pay for 35 shares owned by plaintiff of the capital stock of Kilgo Motor Freight, Inc., a North Carolina corporation with its principal place of business in Mecklenburg County, North Carolina, at a price of $1,100 a share, heard upon a motion of Tri-State Motor Transit Company to dismiss the action upon the fol-

lowing grounds: (1) lack of jurisdiction; (2) the action does not arise out of business transacted or activities performed in North Carolina; and (3) the action not arising in North Carolina, and all parties being nonresidents of North Carolina, the maintenance of the action would be contrary to the interests of justice and to the convenience of parties and witnesses.

The parties stipulated that "Tri-State Motor Transit Company received from the Secretary of State, State of North Carolina, by registered mail, copies of the summons, extension of time to file complaint, order for service of complaint, and the complaint." This was pursuant to the provisions of G.S. 55-144 and 55-146. The motion was heard upon oral testimony, depositions, affidavits, and exhibits offered by plaintiff and Tri-State.

Judge Walker entered an order, the relevant parts of which are:

"And the Court having heard and considered all of the evidence presented, and the arguments and contentions advanced by counsel for the parties, and the Court having found and concluded:

"1. That the defendant, Tri-State Motor Transit Company, is a non-resident of the State of North Carolina, it being a Delaware corporation with its principal office and place of business in the State of Missouri, and has never procured a certificate of authority to transact business in the State of North Carolina;

"2. That the plaintiff is a non-resident of the State of North Carolina, being a corporation organized and existing under the laws of a State other than the State of North Carolina, and having its principal place of business in the State of South Carolina;

"3. That the evidence presented to the Court fails to show that the defendant, Tri-State Motor Transit Company, during any relevant period, engaged in transacting business in the State of North Carolina so as to make it subject to the jurisdiction of the Courts of this State;

"4. That no cause of action stated in the Complaint filed in this case arises out of any business transacted by the defendant, Tri-State Motor Transit Company, in the State of North Carolina;

"5. That the service of process attempted in this case pursuant to the provisions of North Carolina General Statutes, Sections 55-144 and 55-146 was not authorized by the law of this State under the facts shown by the evidence before the Court and accordingly such attempted service is ineffectual, null and void;

"Now, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the Motion to Dismiss filed herein by the defendant, Tri-State

Motor Transit Company, be and the same is hereby granted, and the action is hereby dismissed with the costs to be taxed to the plaintiff."

From the order of dismissal of plaintiff's action, it appeals.

*Ervin, Horack, Snepp & McCartha by Frank W. Snepp for plaintiff appellant.*

*Blakeney, Alexander & Machen by Ernest W. Machen, Jr., for defendant appellee, Tri-State Motor Transit Company.*

*Of Counsel: Linde, Thomson, Van Dyke, Fairchild & Langworthy for defendant appellee, Tri-State Motor Transit Company.*

PARKER, J.  Plaintiff requested Judge Walker in writing to make certain findings of fact and conclusions of law. It assigns as error the judge's refusal to make the fifth finding of fact requested by it, which reads:

"5.  On or about September 28, 1960, the defendant, Tri-State Motor Transit Company, through its duly authorized agent, to-wit: its President, assumed complete management and control of Kilgo Motor Freight, Inc., and through its said agent, entered into and remained within the State of North Carolina for this purpose until on or about May 1, 1961, pursuant to the contract referred to, and under authority of the Interstate Commerce Commission. The said defendant continued to exercise complete management and control of Kilgo Motor Freight, Inc. until on or about May 1, 1961, when said defendant withdrew from such management and control, and refused to consummate the stock purchase from the plaintiff and other stockholders of Kilgo pursuant to the said contract."

It also assigns as error the judge's refusal to make the following conclusions of law as requested by it:

"1.  The defendant, Tri-State Motor Transit Company, was transacting business in the State of North Carolina, during the period of September 28, 1960, until on or about May 1, 1961, without first procuring a certificate of authority so to do from the Secretary of State.

"2.  The breach of contract alleged by the plaintiff in this action arose out of such business.

"3.  The Court has jurisdiction over the person of the defendant, Tri-State Motor Transit Company."

Plaintiff also assigns as errors Judge Walker's third, fourth, and fifth findings and conclusions, and his order dismissing its action, and taxing it with the costs.

Defendant's evidence shows these uncontradicted facts:

Tri-State, a Delaware corporation with its principal place of business in Joplin, Missouri, is a common carrier of freight by motor vehicles with operating rights from the Interstate Commerce Commission through approximately ten central and southwestern states. Its major business is a common carrier of explosives and dangerous items in interstate commerce. It has never been domesticated in North Carolina, and has never obtained authority to do business in this State. It had no direct connection with motor lines in North Carolina, operated no road equipment in this State, and had no employees in this State prior to 1960.

Feeling a need, or at least a desire, for increase of its business, in order to diversify the products it was permitted to haul, and to expand its operations and build up its revenue, it in the spring of 1960 became interested in acquiring control of Kilgo Motor Freight, Inc., a North Carolina corporation with offices in Charlotte, North Carolina, and in Greenville and Greer, South Carolina, which was a common carrier of general commodities by motor vehicles with operating rights from the Interstate Commerce Commission over routes extending from South Carolina to New York, and westward to Pittsburgh, Pennsylvania, and Dayton, Ohio. Kilgo did not operate in any area covered by Tri-State. Their lines did not connect, and there was no traffic flow between them.

Prior to 1960 plaintiff and other persons or corporations in South Carolina acquired controlling interest in Kilgo, their total purchases of Kilgo capital stock having reached 210 shares out of its 368 shares outstanding, or 57% of all its shares outstanding. Mr. Paul L. Andrews of Nashville, Tennessee and of Greenville, South Carolina, president of Kilgo, owned the remaining 43% of all its shares outstanding.

In the spring or early summer of 1960 George F. Boyd, president and general manager of Tri-State, had a conference in Greenville, South Carolina, with Paul L. Andrews, president of Kilgo, in respect to Tri-State's acquisition of a controlling interest in the capital stock of Kilgo. Andrews arranged a series of meetings between Boyd and others representing Tri-State and plaintiff and the other persons or corporations owning 57% of all the Kilgo stock outstanding for the purchase of their controlling stock ownership. On 17 August 1960 Tri-State entered into a contract with Benjamin O. Johnson of Spartanburg, South Carolina, who was acting as attorney for plaintiff and the other persons or corporations owning 57% of all the Kilgo stock outstanding, by the terms

of which the owners of the 57% of all the Kilgo stock outstanding agreed to sell to Tri-State, and Tri-State agreed to purchase from them, their 57% ownership of all stock outstanding of Kilgo at a price of $231,000. This contract provides, *inter alia*, that "all parties of this agreement understand that the purchase herein contemplated is in all respects subject to prior approval by the ICC." It also provides in part: "It is agreed that as soon as the same can reasonably be accomplished the parties will file an appropriate application (or applications) with the ICC (and other governmental agencies having jurisdiction) for authority to consummate the transaction herein proposed and for temporary control pursuant to the management contract made a part hereof." This contract also provides as follows:

"11. TEMPORARY MANAGEMENT CONTROL: In connection with the application to ICC under Section 210a(b) of the ICC Act as provided under Paragraph 7 above, it is further agreed as follows:

"(a) That for a period of 180 days commencing with approval hereof by the ICC and continuing for such additional periods as said ICC may authorize, Sellers grant to Buyer, and Buyer accepts the management of the operation of Kilgo.

"(b) The authority to so manage Kilgo shall include but not be confined to the payment and collection of accounts, the hiring and firing of employees, the purchase, lease and sale of motor carrier equipment, and the general supervision of Kilgo's business, it being intended that for all practical intent and purposes Buyer shall be substituted for Kilgo's Board of Directors in the management and control of Kilgo's business affairs including the specific right to execute checks, notes and commercial instruments in the name of Kilgo.

"(c) Buyer will arrange for sufficient funds to enable Kilgo to effectively prosecute its business activities in an efficient and profitable manner. Buyer is specifically granted the sole and exclusive right to determine the extent to which it shall trade, sell, purchase and lease equipment as in its opinion is for Kilgo's best interests.

"(d) Buyer agrees that during the period this temporary management control remains effective it will not permit the net deficit of Kilgo to increase by more than $100,000 in excess of the net deficit existing as of the close of business or the date Buyer so assumes management control. In computing any such net deficit of Kilgo, usual and applicable accounting principles and proce-

dures shall be followed. If said net deficit should increase by more than $100,000 and if this agreement shall not be consummated, then said additional deficit over and above said $100,000 as adjusted shall be paid by Buyer to Kilgo.

"(e) It is further agreed that in consideration of the stock purchase hereinbefore set forth, Buyer shall receive no compensation for its services hereunder, except that it may charge to Kilgo the actual out of pocket travel expenses its management may incur in performing their duties in connection with Kilgo."

This contract was signed as follows:

> "BY:   (s) BENJAMIN O. JOHNSON
>           Attorney for Sellers.
>
> TRI-STATE MOTOR TRANSIT COMPANY
> (Formerly Westport Properties Corporation).
>
> BY:   (s) GEORGE F. BOYD
>           President and Treasurer."

Beneath the signature of George F. Boyd on this contract appears the following:

> "I, the undersigned Paul L. Andrews, being the owner of the remaining 158 shares of the outstanding stock of Kilgo Motor Freight, Inc., covered by the foregoing agreement, do hereby consent to and concur in the foregoing agreement.
>
>                           (s) PAUL L. ANDREWS"

This contract was negotiated, drafted, and executed in Johnson's office in Spartanburg, South Carolina.

In this contract the parties agreed in order to facilitate the transfer of the 210 shares of Kilgo stock owned by plaintiff and the other persons or corporations, designated as the sellers, to Tri-State that an escrow arrangement will be established with the American Commercial Bank of Charlotte, North Carolina, subsequently merged into the North Carolina National Bank, as escrow agent for the parties to the contract. This escrow arrangement provided as follows:

> "The Sellers will deposit with the Escrow Agent their certificates for the 210 shares duly endorsed for transfer with necessary stock powers attached. The escrow arrangement shall make provision for delivery of said shares to Buyer on full and final payment of

the purchase price to the Escrow Agent. The Buyer will forthwith deposit with the Escrow Agent the amount of $25,000 in cash or U. S. Government securities of equal amount having a maturity of not greater than one year from date of this agreement. The Buyer's deposit shall be applied to the payment of the first installment of the purchase price due on the closing date. In event of final denial of approval of this agreement by ICC, then the escrowed deposits shall be returned to the respective parties."

An escrow arrangement as specified in the contract was executed by the parties on the same day the contract was executed by them.

On 25 August 1960 Tri-State filed with the Interstate Commerce Commission, Washington, D. C., an application, under section 5 of the Interstate Commerce Act, for authority to acquire control of Kilgo Motor Freight, Inc., through ownership of capital stock. On the same date Tri-State and Kilgo filed with the Interstate Commerce Commission an application for approval, under section 210 a(b) of the Interstate Commerce Act, of the temporary operation of motor carrier properties sought to be acquired under separately filed application under section 5 of the Interstate Commerce Act.

On 12 September 1960 the Interstate Commerce Commission entered an order granting Tri-State authority "to assume temporary control of Kilgo, through management, for a period not exceeding 180 days, beginning with the date hereof, unless otherwise ordered, at a nominal management fee of $1 * * *."

On 1 February 1961 the Interstate Commerce Commission entered an order granting Tri-State authority to acquire control of Kilgo through purchase of its capital stock upon the terms and conditions agreed upon, and further decreeing that unless the authority herein granted is exercised within 90 days from the date hereof, this order shall be of no further force and effect.

On 28 September 1960 Tri-State sent George F. Boyd, its president and General manager, to North Carolina to take over active management control of Kilgo. From 28 September 1960 until 1 May 1961, Boyd spent the majority of his time either in Charlotte, North Carolina, or in South Carolina, or over the Kilgo operations in trying to assist it in operations. Kilgo had an office in Charlotte. Boyd solicited freight transportation business for Kilgo. He hired J. H. Santeen as general sales manager for Kilgo. He hired Mr. Griggs as assistant manager for Kilgo, fixed his salary, and Griggs worked under his direction. After he took over management control of Kilgo, he negotiated a loan from Farmer and Ochs for Kilgo, and requested a resolution from Kilgo's board of directors approving it, and received it. He bought

several trailers for Kilgo while he was exercising temporary manage-
ment control, and requested approval by Kilgo's board of directors for
such purchase, and received it. He negotiated the renewal of a note
upon which Kilgo was liable. While he was in temporary management
control of Kilgo, Tri-State loaned Kilgo over $273,000, which Kilgo
has never repaid. Boyd made recommendations to Kilgo's board of
directors to improve Kilgo's operations, and Kilgo's board acted fa-
vorably upon his recommendations. He and Mr. Martin, safety man
and personnel man for Kilgo, who worked under his supervision and
control, had negotiations with a union representing Kilgo's employees
in respect to a modification of the union contract. None of his recom-
mendations to Kilgo's board of directors were turned down by the
board when he asked for action, as he recalls. He gave Mr. Willis, an
employee of Kilgo, written instructions that a separate account be
maintained by Kilgo for taxes, and that moneys deposited in this ac-
count should not be used for any other purposes. He hired and set the
salaries for a number of Kilgo's employees. Boyd received no com-
pensation from Kilgo. Except for Boyd's activities in respect to Kilgo's
operations and management, Tri-State has not had any officer or em-
ployee in North Carolina, prior to a day or two before 1 May 1961 as
hereinafter set forth.

On Sunday prior to 1 May 1961, Boyd, Mr. Thompson, Tri-
State's corporate counsel from Kansas City, Missouri, Mr. Morgan,
Tri-State's Commerce Counselor from Oklahoma City, Oklahoma, and
a director of Tri-State, whose name does not appear in the record, had
a meeting with Benjamin O. Johnson, attorney for the sellers of 57%
of all the Kilgo capital stock outstanding, in Charlotte, North Caro-
lina. In this meeting the representatives of Tri-State stated that Tri-
State had serious financial difficulties that might prevent consummation
of the purchase by it of the control through stock ownership of Kilgo.
Johnson said he would confer with his people in South Carolina. The
next day in Spartanburg, South Carolina, there was a meeting between
Tri-State's representatives, who had met with Johnson in Charlotte,
and Johnson and the selling stockholders of Kilgo he represented. In
this meeting Tri-State's representatives explored the possibilities of
some means whereby assurances would be given by the sellers that
they would support Tri-State and Kilgo with freight and help Tri-
State overcome its financial troubles in closing the purchase. The sell-
ing stockholders of Kilgo gave Tri-State nothing specific in the way
of help. Whereupon, by letter dated 2 May 1961 from Oklahoma City,
Oklahoma, Tri-State notified Johnson that its available funds were
exhausted, and it could not consummate the purchase of the controlling
stock of Kilgo, and that it had notified the Interstate Commerce Com-

mission that the purchase will not be consummated, and the temporary management control is terminated.

Subsequent to 1 May 1961 Kilgo was placed or went into receivership.

G.S. 55-144 reads: "Whenever a foreign corporation shall transact business in this State without first procuring a certificate of authority so to do from the Secretary of State * * *, then the Secretary of State shall be an agent of such corporation upon whom any process, notice, or demand in any suit upon a cause of action arising out of such business may be served."

The uncontradicted evidence is that Tri-State is a Delaware corporation, and that it has never procured a certificate of authority from the Secretary of State of North Carolina to transact business in North Carolina. The parties stipulated that service of process was had upon the Secretary of State of North Carolina, as provided by G.S. 55-146. For the service of process in the instant case upon the Secretary of State to be valid and binding upon Tri-State, two things must exist, by reason of the express provisions of G.S. 55-144: (1) Tri-State must have transacted business in North Carolina, and (2) the cause of action here must have arisen out of such business. The provisions of G.S. 55-144 are not available for transitory foreign causes of action. *R. R. v. Hunt & Sons, Inc.,* 260 N.C. 717, 133 S.E. 2d 644.

G.S. 55-144 went into effect 1 July 1957. G.S. 55-38, a comparable statute in effect prior to 1 July 1957, required that a foreign corporation be "doing business in this State," and many of our decisions are under G.S. 55-38. In respect to G.S. 55-38 and G.S. 55-144, the Court said in *Worley's Beverages, Inc. v. Bubble Up Corporation,* 167 F. Supp. 498: "However, it is generally considered that changing the statute from 'doing business' to 'transacting business' only had the effect of liberalizing the statute."

In *Lambert v. Schell,* 235 N.C. 21, 69 S.E. 2d 11 (1952), the Court said: "Doing business in this State means doing some of the things or exercising some of the functions in this State for which the corporation was created. *Ruark v. Trust Co.,* 206 N.C. 564, 174 S.E. 441; *Radio Station v. Eitel-McCullough, supra* [232 N.C. 287, 59 S.E. 2d 779]; *Harrison v. Corley,* 226 N.C. 184 [37 S.E. 2d 489]; and cases cited. And the business done by it here must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction and is, by its duly authorized officers and agents, present within the State. [Citing authority.]"

In *Ruark v. Trust Co.,* 206 N.C. 564, 174 S.E. 441, the Court said: "The expression 'doing business in this state,' as used in C.S. 1137 [later G.S. 55-38], means engaging in, carrying on, or exercising, in this

State, some of the things, or some of the functions, for which the corporation was created."

Ballentine, Law Dictionary, 2d Ed., defines the words "transacting business within the state" as "The transaction within the state of some substantial part of a party's ordinary business, which must be continuous in the sense that it is distinguished from merely casual or occasional transactions, and must be of such a character as will give rise to some form of legal obligations."

What we have quoted above from the *Lambert* and *Ruark* cases as to the meaning of the expression "doing business in this State," as used in G.S. 55-38, is also accurate as to the meaning of "shall transact business in this State," as used in G.S. 55-144. However, it is to be distinctly understood that no all-embracing rule as to what is the meaning of "shall transact business in this State" is here formulated. This question must be determined largely according to the facts of each individual case rather than by the application of fixed, definite, and precise rules. *Harrison v. Corley,* 226 N.C. 184, 37 S.E. 2d 489 (1946).

" 'Presence' in the state in this sense has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given." *International Shoe Co. v. Washington,* 326 U.S. 310, 90 L. Ed. 95.

In *Harrison v. Corley, supra,* the Court held that when a foreign corporation accepts the provisions of G.S. 55-38, by engaging in business here without domesticating or appointing a process agent, "it cannot, by the simple expedient of closing shop and departing this jurisdiction, withdraw that assent so as to defeat a suit instituted on a cause of action which arose while it was engaged in business here."

Generally, it has been held or recognized that the mere ownership or control by a foreign corporation through a majority stock ownership of the stock of another corporation which is doing business within a state, either resident or domesticated, does not, in and of itself, constitute doing business within the state by the foreign corporation for the service of process so as to subject it to the state's jurisdiction, where the foreign corporation is not created for the very purpose of holding such stock and the two corporations remain distinct entities. *Steinway v. Majestic Amusement Co.,* 179 F. 2d 681, 18 A.L.R. 2d 179, *cert. den.* 339 U.S. 947, 94 L. Ed. 1362; Annot. 18 A.L.R. 2d 189, II § 3, where many cases are cited; 18 Fletcher, Cyclopedia Corporations, §§ 8721, 8773 and 8774 (perm. Ed. Rev. 1955); 20 C.J.S., Corporations, § 1841; 23 Am. Jur., Foreign Corporations, §§ 374 and 375.

However, where a foreign corporation acquires and holds controlling stock interest in a domestic corporation, and comes into the state where the domestic corporation is created and doing business, and there itself by its officer or officers transacts business of the domestic corporation and manages and controls its internal affairs, then such foreign corporation is doing business within the domestic state and is subject to the jurisdiction of its courts. *Bergold v. Commercial Nat. Underwriters, Inc.,* 61 F. Supp. 639; *Bankers Holding Corp. v. Mayberry,* 161 Wash. 681, 297 P. 740, 75 A.L.R. 1237; 18 Fletcher, Cyclopedia Corporations, § 8721, pp. 493-94, § 8773, p. 821 (Perm. Ed. Rev. 1955); 23 Am. Jur., Foreign Corporations, § 374, p. 362; 30 Mich. Law Review 1114. See *Clover Leaf Freight Lines v. Pacific Coast Wholesalers Ass'n,* 166 F. 2d 626 (7 Cir. 1948); *Groel v. United Electric Co.,* 69 N.J. Eq. 397, 60 A. 822; Annot. 18 A.L.R. 2d § 6, p. 198; 60 Yale Law Journal 908.

In *Bankers Holding Corp. v. Maybury, supra,* the Court said:

> "We do not hold that isolated transactions, whether commercial or otherwise, performed in this state by a foreign corporation constitute doing business within this state. But we do hold that, where a foreign corporation is formed for a particular purpose, to wit, acquiring, owning, and voting a majority of the corporate stock of other banking institutions, and comes into this state and carries out the very purposes and objects for which it was created, it is 'doing business' within this state."

Plaintiff assigns as error Judge Walker's 3rd finding and conclusion "that the evidence presented to the Court fails to show that the defendant, Tri-State Motor Transit Company, during any relevant period, engaged in transacting business in the State of North Carolina so as to make it subject to the jurisdiction of the Courts of this State." This is not a finding of fact, but a pure conclusion of law. Judge Walker should have found as facts from the evidence the authority vested in Tri-State by the contract between the sellers and itself, which was consented to and concurred in by Paul L. Andrews, as to temporary management control of Kilgo by Tri-State, and the authority vested in Tri-State by order of the Interstate Commerce Commission as to temporary control of Kilgo by Tri-State, and what acts Tri-State did when it came into the State by its president and general manager Boyd, pursuant to such authority, and assumed active control and management of Kilgo in North Carolina, so that it can be determined upon the facts found by him whether or not such activities by Tri-State in North Carolina were "substantial," "continuous and systematic," and "regular," as distinguished from "casual," "single" or "isolated acts," and that Tri-

State by such activities was transacting business in this State under the relevant rules of law above stated, and within the intent and meaning of G.S. 55-144.

Plaintiff assigns as error Judge Walker's 4th finding and conclusion "that no cause of action stated in the Complaint filed in this case arises out of any business transacted by the defendant, Tri-State Motor Transit Company, in the State of North Carolina." This is not a finding of fact, but a pure conclusion of law. The written contract is not the cause of action stated in the complaint, but breach in the performance thereof. The judge should have found specifically the facts in respect to the alleged breach of the contract, in order that it can be determined upon the facts found whether or not plaintiff's cause of action arises out of business transacted by Tri-State in North Carolina.

Plaintiff assigns as error his order dismissing its action and taxing it with the costs. Judge Walker's order dismissing plaintiff's action is not supported by determinative findings of fact on the crucial questions presented for decision and it must be vacated, and the cause is remanded for further specific findings of fact, and then for the entry of an order based upon the findings of fact and the conclusions of law made from such findings of fact in accordance with law. *Sizemore v. Maroney*, 263 N.C. 14, 138 S.E. 2d 803, and cases cited.

Error and remanded.